T.C. Memo. 1998-121


UNITED STATES TAX COURT


BOBBY E. WELCH, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


BOBBY E. WELCH AND KATHLEEN NEWMAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 23725-95, 24065-95.         Filed March 30, 1998.


Wayne Hagendorf, for petitioners.

Steven M. Roth, for respondent.


MEMORANDUM OPINION


WRIGHT, Judge: In these consolidated cases respondent determined deficiencies, additions to tax, and penalties in petitioners' Federal income taxes as follows:

Bobby E. Welch, docket No. 23725-95

| | | Additions to Tax | | | |
|------|------------|-------------|----------------|-------------------|------------|
| Year | Deficiency | Sec. 6651(a) | Sec. 6653(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6661(a) |
| 1986 | $173,118 | $43,517 | --- | $8,703 | $10,107 |
| 1987 | 27,070 | 6,860 | --- | 1,372 | 5,722 |
| 1988 | 25,958 | 6,564 | $1,313 | --- | 4,952 |

All section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

Pursuant to section 6653(a)(1)(B) respondent also determined additions to tax for 1986 and 1987 in amounts equal to 50 percent of the interest due on the respective deficiencies.

Bobby E. Welch & Kathleen Newman, docket No. 24065-95

| Year | Deficiency | Additions to Tax Sec. 6651(a) | Penalties Sec. 6662(a) |
|------|------------|-------------|----------------|
| 1989 | $49,091 | $12,327 | $9,818 |
| 1990 | 74,461 | 18,634 | 14,892 |

The deficiencies result from increases in gross income based on bank deposit analyses and the disallowances of net operating loss carryovers. The primary issues concern those adjustments and whether petitioners are liable for the additions to tax and penalties for the years at issue. Respondent has made some concessions that will be reflected in the Rule 155 computations.

## Summary of Background Facts

Certain facts have been stipulated and are so found. The stipulation of facts with attached exhibits is incorporated herein by this reference.

Petitioners resided in Glendale, California, at the time the petitions were filed in these cases.

During all the years at issue Bobby E. Welch (petitioner) was engaged in the electrical contracting business and had several other ill-defined business activities.  On the Federal income tax returns for these years, petitioner reported the following on Schedules C and claimed net operating loss (NOL) carryovers as follows:

| Year | Gross Receipts | Net Profit | NOL |
|------|---------------|-----------|-----|
| 1986 | $751,169 | $7,713 | $80,853 |
| 1987 | 79,453 | 2,992 | 71,149 |
| 1988 | 64,647 | (166) | 65,455 |
| 1989 | 104,940 | 8,665 | 60,197 |
| 1990 | 179,111 | 9,392 | 51,532 |

Petitioner did not keep books and records from which the gross receipts could be verified.  Respondent performed a bank deposit analysis for each year.  The following total deposits were made to various bank accounts controlled by petitioner:

| Year | Total Bank Deposits |
|------|---------------------|
| 1986 | $1,105,003 |
| 1988 | 150,181 |
| 1989 | 269,491 |
| 1990 | 422,926 |

The following table shows the deposit amounts that are still in dispute:

| Year | Balance of Deposits in Dispute |
|------|-------------------------------|
| 1986 | $352,281 |

| 1988 | 78,231 |
| 1989 | 117,865 |
| 1990 | 165,843 |

In October 1987, petitioner claimed that since 1986 he had made contributions totaling approximately $164,000 to the Church of Scientology (the church).  On the 1986 Federal income tax return, petitioner claimed no deduction for these contributions. On a 1987 return attached to the petition,[1] petitioner showed a $5,787 charitable contribution and a carryover from the prior year in the amount of $51,010.  On the 1989 return, petitioner showed a contribution to the church in the amount of $57,998 and a carryover from the prior year in the amount of $56,797.  On the 1990 return, petitioner showed charitable contributions in the amount of $74,055 and a carryover from prior years in the amount of $105,885.

With respect to the unreported income, the gravamens of petitioner's arguments are that the balances in dispute were either loans from Stanley Zurn (Mr. Zurn) in the amounts of $375,000 in 1986, $70,000 to $75,000 in 1988, $70,000 in 1989,

[1] The record contains two 1987 tax returns.  A copy of one return was attached to the petition.  That return, prepared by Arthur T. Moore, a certified public accountant, is a joint return, and shows the charitable contribution and carryover amounts.  The second return is Exhibit 4-D attached to the stipulation of facts.  That return, prepared by William D. Truax, E.A., Inc., has a filing status of married filing separate and claims no charitable contribution or carryover.  The record is silent concerning this anomaly.

and $180,000 in 1990 or were so-called accommodation deposits[2] from Sergio Antonucci (Mr. Antonucci) in the amounts of $30,000 on January 5, 1989, $7,500[3] on March 31, 1989, and $5,000 on May 15, 1989, through an account under the name of Morgan Stern Group during 1989.

Mr. Zurn testified that he lent petitioner approximately $700,000 over the years in question. With the exception of a copy of an alleged journal pertaining to funds received from Mr. Zurn to construct an apartment building, see discussion infra, there are no documents showing transfers of funds between petitioner and Mr. Zurn. During this time petitioner did perform services for Mr. Zurn and/or Zurn-related activities.

With regard to the NOL carryovers, petitioner alleges that he suffered an NOL in 1984 in the amount of $146,058, which, together with a carryover from prior years in the amount of $4,907, produced an NOL carryover in the amount of $150,965. Petitioner introduced a copy of his 1984 return that was allegedly filed and included, inter alia, a Schedule C reporting

---

[2] As we understand it, Mr. Antonucci would allegedly send money to petitioner's account, and then later petitioner would pay the money to Mr. Antonucci or have it paid on the latter's behalf.

[3] The transcript refers to this amount as $75,000. The exhibit to which the testimony related shows $7,500 to be the actual amount.

gross receipts in the amount of $737,86_.[4] Arthur T. Moore (Mr. Moore), a certified public accountant, prepared petitioner's 1984 return from information supplied by petitioner and sent the return to petitioner. Petitioner has no original books or records supporting the figures that appear on the copy of the 1984 return. Petitioner, however, has a work sheet allegedly prepared in-house showing a trial balance of his business as of December 30, 1984. Mr. Moore did not know whether the 1984 return that he prepared was filed, and petitioner did not testify that he filed the return. The record does not contain any information concerning petitioner's 1981, 1982, 1983, and 1985 tax returns.

Petitioner did not testify as to the date that he filed the returns for the years at issue. A copy of the 1986 return shows that petitioner executed that return on September 26, 1992. That return was prepared by "Greenberg & Jackson, CPA'S" (Greenberg firm). A copy of the return for 1987 attached to the petition shows that it was prepared by Mr. Moore and shows a date of February 20, 1994, whereas a copy of the 1987 return attached to the stipulation of facts is undated and shows that it was prepared by "William D. Truax, E.A., Inc." (Truax). A copy of the 1988 return indicates that it was prepared on August 19, 1992, by Truax. Copies of the 1989 and 1990 returns show that

---

[4] The copy of this return cuts off the last digit on the right-hand column of the Schedule C.

they were prepared by Mr. Moore and bear the date of February 20, 1994. There is no explanation as to the reasons why the tax returns were not timely filed. No one from the Greenberg firm or Truax testified concerning the preparation of the returns for 1986 and 1988. Mr. Moore testified that he prepared the returns for 1989 and 1990 from information petitioner gave him.

During the redirect examination of petitioner, he testified that in making deposits during 1986, he received "cash back" from checks that were deposited, and, therefore, he made net deposits. The total amount of the so-called cash back was $5,713. In reconstructing petitioner's 1986 gross income by the bank deposit method, respondent had used the net deposits shown on the monthly statements from the bank. At the close of the testimony respondent orally moved to amend the answer for the 1986 taxable year and increase petitioner's gross income by the amount of $5,713. The Court took respondent's oral motion and petitioner's objection thereto under advisement.

## Discussion

Petitioner does not dispute the amount of the deposits that went into his bank accounts as determined by respondent. Rather, he contends that the difference between the total deposits and the gross income reported results from the loans from Mr. Zurn and the so-called accommodation deposits from Mr. Antonucci. There is no question that the funds were actually received. The only question is whether petitioner has established that the

funds in dispute were derived from nontaxable sources. Rule 142(a); Tokarski v. Commissioner, 87 T.C. 74 (1986); see also Rockwell v. Commissioner, 512 F.2d 882, 885-887 (9th Cir. 1975). We turn to an examination of the facts concerning the two alleged sources of the deposits.

Funds From Mr. Zurn

Petitioner's relationship with Mr. Zurn may be described as, to say the least, confusing. Indeed, there is even confusion as to when petitioner and Mr. Zurn became associated. Petitioner testified that he met Mr. Zurn in 1984. However, in a prior trial involving Mr. Zurn's tax liabilities, petitioner testified that they became associated in 1987, or possibly 1986. This date is important because petitioner alleges that he received funds from Mr. Zurn in 1985 and 1986 to construct an apartment building (referred to herein as the Montrose property). Petitioner's version of the events, however, is questionable in light of a loan application dated July 14, 1986, in which petitioner stated that he was receiving monthly rental income from the Montrose property in the amount of $5,640. Finally, there is the peculiar grant deed dated August 2, 1985, purportedly conveying the Montrose property to Mr. Zurn and a John Nuckols. Petitioner testified that at the time he conveyed the property to Messrs. Zurn and Nuckols, Mr. Zurn had advanced at least $50,000 to

construct the improvements.[5]  But that is contradicted by
petitioner's alleged journal on the Montrose property showing
that moneys were not spent in any amounts until after August 1,
1985.[6]  We are faced, therefore, with inconsistencies not only in
petitioner's testimony but also between his testimony and the
documents.

These are not the only weaknesses in the alleged Welch/Zurn
financial relationship.  There are no indicia of a normal
debtor/creditor relationship supporting petitioner's version of
the facts.  There were no notes, no due dates or payment
schedules, and no stated rate of interest.[7]  Indeed, at the
trial, while both petitioner and Mr. Zurn testified that

---

[5]  We have tried in vain to correlate the checks from Mr.
Zurn that were deposited in the Montrose property account with
the expenditures listed on the alleged journal on the Montrose
property.

[6]  Respondent objects to Exhibit 44AR, which was offered as
a record of Mr. Zurn's advances to the Montrose property.  The
only reference that may be to Mr. Zurn is an ambiguous notation
on page 2 of Exhibit 44AR that reads "$202.31 - 18 Dec. - 15 shts
3/4 CDX Grossman's - pd by Stan Zurn".  We do not accept that
this was a contemporaneous record of funds allegedly borrowed by
petitioner.  We do admit the exhibit as a record created by
petitioner, but we have little confidence in the document as
being a record of loans from Mr. Zurn to petitioner.

[7]  Petitioner argues that the interest rate at the beginning
was 6 percent and then was changed to 17.136 percent, as
evidenced by a notation on the alleged journal on the Montrose
property.  The reference in the journal reads "Feb. 21, 85 to
B.W. 17.136%."  Whatever this may refer to, we do not believe
that it relates to the interest that petitioner was expected to
pay.  We note further that petitioner did not claim any deduction
for interest on his 1986 tax return.

petitioner was still indebted to Mr. Zurn, neither could give a definite current balance of the debt. Furthermore, during the time that petitioner was allegedly borrowing approximately $700,000 from Mr. Zurn to keep his businesses going, he also allegedly gave approximately $300,000 to the church and/or charities. While allegedly all of the funds lent in 1986 were used for the Montrose property, $47,000 from the account to which the alleged loans from Mr. Zurn were deposited was sent to the church. This was at a time when at least Mr. Zurn was under the impression that "Things were kind of tough [for petitioner]."

Moreover, there is the matter of the "Community Land & Oil Corporation Trust Lot 2160" transaction (Lot 2160 transaction) in 1989. While the facts surrounding the Lot 2160 transaction are unclear, during 1989 Mr. Zurn issued a check in the amount of $258,351 to the "Fountain Exchange", which went into an account that petitioner controlled to purchase Lot 2160, a parcel of real estate that petitioner owned. Later Mr. Zurn allegedly determined that Lot 2160 was not worth the money that he had paid. It is unclear exactly what happened next, but it is clear that petitioner never returned the $258,000.[8] It is also strange that, notwithstanding Mr. Zurn's view that petitioner had sold him a worthless lot for $258,000, according to their testimonies,

_____

[8] The Lot 2160 transaction has been before the Court before in Zurn v. Commissioner, T.C. Memo. 1996-386. In that case we determined, partly on the basis of this transaction, that Mr. Zurn had committed tax fraud.

Mr. Zurn continued to advance petitioner money without any security or, indeed, any notes of the debt.

Finally, we are troubled by Mr. Zurn's lack of specificity as to the sources of the funds allegedly lent to petitioner.[9] In Zurn v. Commissioner, T.C. Memo. 1996-386, we found that during 1986 and 1987 Mr. Zurn had advanced $677,652 to an entity known as Cities Development Group, Inc. (Cities). If petitioner's version that the 1986 deposits in the amount of $375,000 came from Mr. Zurn is to be believed, then Mr. Zurn lent over $1 million during this time. Mr. Zurn's Federal income tax returns during this period clearly do not reveal the sources of the funds that gave rise to this benevolent lending. We recognize that Mr. Zurn owned various rental properties that could generate cash that would not reflect taxable income, but even the gross income from rentals does not explain the source of these funds. While Mr. Zurn did sell some property for approximately $104,000, that and the gross rents are far from the $1 million allegedly lent.

Taking all the confusion, contradictions, and other anomalies in Mr. Zurn's and petitioner's testimonies into account, we do not find it believable that loans from Mr. Zurn

---

[9] Mr. Zurn testified that

> The source would have been previous monies that I had, it would have been real estate money, it would have been any property that was sold, it would have been borrowed money, it would have been family money, what--what I had, you know, the different sources.

were the source of petitioner's unexplained deposits for any of the years in question. Even accepting the alleged unusual business habits of both, we cannot accept that some $700,000 in loans exchanged hands. It is clear that funds did flow between Mr. Zurn and petitioner, but it is also clear that petitioner performed services for Mr. Zurn. We do not know the reasons for many of the transfers. At least in the case of the funds involved on the so-called Lot 2160 transaction, while we do not know details of the transaction, it certainly appears that from petitioner's position some type of taxable transaction took place and that transaction was not reported on petitioner's tax return. While it may be that Mr. Zurn did lend petitioner money, the paucity of records of both Mr. Zurn and petitioner makes it impossible to separate the possible wheat from the definite chaff in the transfers of funds between the two. Accordingly, we sustain respondent's determinations based on the bank deposit analyses for all the years at issue.[10]

The Accommodation Deposits

During 1987 through 1989, Mr. Zurn and petitioner were engaged in some type of an alleged export activity under the name

_____

[10] There are other peculiarities. For example, the gross income on petitioner's 1986 Schedule C reflects $751,169 and a net profit of $7,713. In an income statement prepared by Mr. Moore for the first 9 months of 1986, petitioner's gross income was shown to be $853,122 with a net profit of $108,058. While Mr. Moore prepared the income statement, he did not prepare the 1986 tax return.

of Star Global.  Star Global had been owned by either Paul Tallis (Mr. Tallis) or Mr. Tallis and petitioner.  Sometime between the end of 1987 and the beginning of 1989, Mr. Tallis sold Star Global to Mr. Zurn.  Mr. Tallis remained with Star Global until January 1989.  After he acquired an interest in Star Global, Mr. Zurn did not have signatory authority over Star Global's bank account.  Petitioner and his wife had that authority and used the account as their account.  At some point, petitioner became acquainted with Mr. Antonucci.  Mr. Antonucci did not testify, and there was no explanation as to the reason that he was unavailable.  Mr. Tallis testified that "He [Mr. Antonucci] basically was--he ostensibly was there to show us how to do things like trusts, et cetera.  He was quite a flashy guy.  He's have [sic] a Rolls Royce and--and he'd run his money through our accounts because he--that's what he wanted to do".  There are no documents that connect Mr. Antonucci with any deposits to or subsequent withdrawals from the Star Global bank account.  Mr. Tallis, however, could identify one wire transfer deposit made on January 5, 1989, in the amount of $30,000 and a withdrawal in the amount of $30,000 made on January 9, 1989, from Mr. Antonucci.[11]

---

[11]  At first Mr. Tallis identified several other deposits and withdrawals as being part of Mr. Antonucci's transactions. These transactions, however, took place after Mr. Tallis had left Star Global.  Petitioner testified that $14,500 was from Mr. Antonucci.  We have been unable to identify either the deposit or a withdrawal.

In considering both the deposits from purported loans and the accommodation deposits, we are left with the decided impression that petitioner is engaged in a shell game. We have no confidence in petitioner's testimony. Nonetheless, we do accept Mr. Tallis' testimony that the deposit of January 5, 1989, in the amount of $30,000 was not income to petitioner. None of the other alleged accommodation deposits were verified by another party, nor is there a clear trail of a withdrawal of the funds. With the exception of the $30,000 January 5, 1989, deposit, we reject petitioner's argument concerning the accommodation deposits.

## Increased Income and Deficiency--1986

At the close of the evidence respondent orally moved to amend the answer to conform to the evidence and to increase the deficiency by the tax on $5,713 for 1986. Petitioner objects to the amendment. We agree with respondent. See Rule 41(b)(1) and (2). The evidence underlying respondent's motion was introduced by petitioner on redirect examination for petitioner's own reasons. Petitioner's testimony, however, is a double-edge sword, a cut from which petitioner now seeks to avoid. In this regard, petitioner does not dispute that the amount involved was not included in respondent's bank deposit analysis, nor does he disavow his testimony that he received cash from the items deposited.

Rather, petitioner argues that respondent should be precluded by the stipulation from raising the issue. In paragraph 6 the parties stipulated that for 1986 the total deposits were $1,105,003. In paragraph 9 the parties stipulated that the "unexplained deposits which remain at issue" for 1986 were $352,281. The problem with petitioner's position is that we are not concerned here with unexplained deposits. To the contrary, the amount in question admittedly was not deposited, and respondent is not attempting to change the amount of deposits which were the subject of the stipulation.[12] Nor do we find convincing petitioner's argument that he was surprised. It was petitioner who brought the subject up during his testimony.

We recognize that any time there is an amendment to a pleading that either increases or decreases a deficiency, there is a pecuniary prejudice to the other party. But that is not the prejudice we are concerned with here. Rather we are concerned with whether petitioner was unfairly prejudiced in presenting his case, and we do not find that type of prejudice. Thus, we will allow respondent to amend the answer in docket No. 23725-95 to increase the deficiency for 1986 by the tax on $5,713.

We next turn to the question whether petitioner had unreported income during 1986 in the amount of $5,713. Since

---

[12] Petitioner appears to argue that the parties stipulated the amount of the deficiency for 1986. If, indeed, that were the case, we are unsure of the reason for a 2-day trial.

this would lead to an increased deficiency, respondent has the burden of proof.  Rule 142(a).  As mentioned, petitioner does not contend that this amount was deposited and not included in respondent's bank deposit analysis.  Petitioner argues in his brief that "the cash was reported on his income tax returns." Petitioner's testimony was as follows:

> Q:  Did you report these monies as income * * * on your tax returns?
>
> A:  I always had a cash item--you know--a cash amount that would be put in * * * because that was pretty visible, and that was part of the record.  On those particular ones, though, I had discussed that with Mr. Shors [the revenue agent who audited petitioners' returns] and he said that he wasn't asking for those, nor would that become part of--or be part of this procedure and trial.

We are somewhat unsure as to the meaning of this testimony.  The Greenberg firm prepared the 1986 return.  There are no documents that indicate that petitioner included the cash in the income figures that he gave the Greenberg firm to prepare that return.  More important, even if he did include cash on his reported gross receipts, the fact is that his total gross income from the bank deposits was $5,713 greater than the total upon which respondent's calculation was made.

With regard to the part of the testimony referring to Mr. Shors, during the audit examination Mr. Shors took the total deposits from the monthly bank statements and not from the deposit slips.  Even if Mr. Shors made some comment during the audit to the effect that he was not concerned with so-called

cash-back deposits, which we doubt, respondent would not be precluded from raising the issue, especially when he relies on petitioner's own testimony.

In sum, we hold that respondent may amend the answer to raise the issue. Furthermore, the evidence clearly established that the gross receipts from the bank deposit analysis for 1986 were understated by $5,713.

## Net Operating Loss (NOL) Carryover from 1984

Petitioner contends that he is entitled to deductions for the taxable years after 1985 for NOL carryovers from the 1984 taxable year. Section 172(a) allows a deduction for an NOL carryover to a taxable year plus an NOL carryback to that year. For the years before the Court, an NOL would be carried back for 3 years and carried over for 15 years.[13] A taxpayer can, however, elect to relinquish the carryback period. Such an election must be made by the due date for filing the taxpayer's return for the taxable year of the NOL for which the election is to be in effect, in a manner prescribed by the Secretary. Sec. 172(b)(3)(C). Such an election:

> shall be made by a statement attached to the
> return (or amended return) for the taxable

---

[13] Before 1986, an NOL could be carried over for 5 years. Sec. 172(b)(1)(B). Sec. 1009(c)(3) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3449, extended the carryover period for NOL's for losses occurring after Dec. 31, 1975, to 15 years.

> year. The statement required * * * shall
> indicate the section under which the election
> is being made and shall set forth information
> to identify the election, the period for
> which it applies, and the taxpayer's basis or
> entitlement for making the election.

Sec. 301.9100-12T(d), Temporary Proced. & Admin. Regs., 57 Fed. Reg. 43893 (Sept. 23, 1992) (redesignating sec. 7.0, Temporary Income Tax Regs., 42 Fed. Reg. 1469 (Jan. 7, 1977) ("Various elections under the Tax Reform Act of 1976")).

Petitioner must first establish that he suffered an NOL for the taxable year 1984. To meet this burden petitioner relies on a purported retained copy of his 1984 return that was prepared by Mr. Moore. That return shows an NOL from petitioner's sole proprietorship "Bob Welch Electric" in the amount of $146,058 and an NOL carryforward in the amount of $4,907. Respondent has no record of the return's being filed and disputes the amount of the NOL claimed. For the purpose of discussion only, we are willing to assume that the return was timely filed and accurately reflects the loss. Petitioner, however, still faces the problem that there is no statement attached to the return identifying that an election has been made. Indeed, there is no evidence that any election to relinquish the carryback was ever made. Thus, under the general rule, the 1984 NOL would be carried back to the 1981, 1982, and 1983 taxable years and carried forward to the 1985 taxable year before it would be carried forward to any of the years before the Court. There is nothing in this record

that provides any basis from which we could determine the amount of the 1984 NOL that was absorbed in the years before 1986, the earliest year before the Court. Accordingly, petitioner has not shown that he is entitled to deductions under section 172 for any of the years before the Court.

Additions to Tax and Penalties

Respondent determined additions to tax for failure to timely file returns under section 6651(a) for all the years at issue; additions to tax for negligence under section 6653(a)(1)(A) and (B) for 1986 and 1987; an addition to tax for negligence under section 6653(a)(1) for 1988; additions to tax for substantial understatements under section 6661(a) for 1986, 1987, and 1988; and accuracy-related penalties for negligence under section 6662(a) for 1989 and 1990.

Section 6651(a) imposes an addition to tax for failure to timely file returns "unless it is shown that such failure is due to reasonable cause and not due to willful neglect". Sec. 6651(a)(1). Reasonable cause "calls on the taxpayer to demonstrate that he exercised 'ordinary business care and prudence' but nevertheless was 'unable to file the return within the prescribed time.'" United States v. Boyle, 469 U.S. 241, 246 (1985) (quoting sec. 301.6651-1(c)(1), Proced. & Admin. Regs). Willful neglect means "a conscious, intentional failure or reckless indifference." United States v. Boyle, supra at 245. It is undisputed that the returns for the taxable years 1986

through 1990 were not timely filed. Furthermore, there is nothing in this record that would even remotely indicate that these failures were due to reasonable cause and not due to willful neglect. Therefore, we sustain respondent's determinations with respect to the additions to tax under section 6651(a) for all the years at issue.

Sections 6653(a) and 6662(a) impose additions to tax and penalties for negligence or disregard of rules or regulations. If any part of the underpayment is due to negligence, under section 6653(a)(1) the addition to tax is equal to 5 percent of the amount of the underpayment. Under section 6662(a) the accuracy-related penalty is equal to 20 percent of the portion of the underpayment due to negligence. It is clear that petitioner is liable for these additions to tax and accuracy-related penalties. Under section 6001 a taxpayer is required to keep records. As far as we can determine, petitioner kept no records from which his (taxable) income could be determined. While petitioner used accounting firms to prepare his returns, as far as Mr. Moore was concerned, petitioner supplied the information in summary fashion. None of the other return preparers testified. With respect to petitioner's gross income, the information was greatly understated. Furthermore, with regard to the accuracy-related penalties, the entire underpayment for each of the taxable years 1989 and 1990 was attributable to negligence. We sustain respondent's determinations with respect

to the additions to tax under section 6653(a) for 1986, 1987, and 1988 and the penalties under section 6662(a) for 1989 and 1990.

Section 6661(a) provides that "If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement." See also Pallottini v. Commissioner, 90 T.C. 498 (1988). There is a substantial understatement if the amount of the understatement exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b)(1)(A). The amount of the understatement shall be reduced if there is substantial authority for the tax treatment of any item or there is disclosure of the relevant facts affecting the item's tax treatment. Sec. 6661(b)(2)(B). The understatements of tax here essentially result from unreported income and the disallowed NOL carryovers, and are substantial under section 6661(b)(1). There was no substantial authority for either position taken, nor was there adequate disclosure of the relevant facts. Therefore, we sustain respondent's determinations with respect to the additions to tax under section 6661(a) for 1986, 1987, and 1988.

Tax on Self-Employment Income

Section 1401(a) imposes a tax "on the self-employment income of every individual". As we understand it, petitioner does not dispute that he is liable for the tax. Rather, he contends that his self-employment income should not be increased by the

disputed unreported income.  His arguments, therefore, are essentially that he had no unreported income.  We have rejected those arguments, and the increased tax on self-employment income follows from that rejection.

To reflect the foregoing,

<u>An order will be issued granting respondent's motion to amend the answer in docket No. 23725-95 and decisions will be entered under Rule 155</u>.