T.C. Memo. 2011-147

UNITED STATES TAX COURT

JOHN C. AND MARGARET T. RAMIG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29149-08.                    Filed June 27, 2011.

<u>Kevin O'Connell</u> and Katherine de la Forest (specially
recognized), for petitioners.

<u>John D. Davis</u> and <u>Katherine Caballero</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  On September 5, 2008, respondent (the
"IRS") issued petitioners a notice of deficiency for tax years
2004 and 2005.  The notice stated that the IRS (i) determined

deficiencies in tax of $953 for 2004 and $22,114[1] for 2005 and (ii) determined that the Ramigs were liable for penalties under section 6662(a)[2] of $190.60 for 2004 and $4,442.80 for 2005. The Ramigs timely filed a petition disputing these determinations; on the date of filing, they were Oregon residents.

The Ramigs claim they are entitled to the following deductions: (i) $8,781 for 2004 for expenses of a rental property; (ii) $6,719.43 for 2004 and $6,573.58 for 2005 for legal expenses; and (iii) $46,131.40 for 2005 for the worthlessness of purported loans. We find that the Ramigs are entitled to the deductions for legal expenses but not for the rental property expenses or the worthlessness of the purported loans.

---

[1]The notice of deficiency and its attached explanation are inconsistent as to the amount of the deficiency in tax for 2005. The first page of the notice states that the deficiency is $22,114. But the attached explanation states that the deficiency is $22,214. The Ramigs do not assert that this error means that $22,114 is the upper bound of the deficiency we can decide in this proceeding. In any event, because we find the Ramigs are entitled to deductions disallowed by the notice of deficiency, the deficiency we decide will be less than $22,114.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code, as amended, effective during the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

The parties stipulated some facts; those facts are so found.

John C. Ramig[3] is an attorney; he is licensed in Oregon. After graduating from the University of Virginia Law School in 1984, he worked in government affairs for a law firm in Washington, D.C. Four years later, he moved his practice to the firm's Portland office and after two more years to another Portland law firm, continuing there until 1995.

Ramig is also an entrepreneur. He left law-firm life in 1995 to form a startup company named Footwear Specialties International, which did business as Nautilus Footwear. Ramig was a minority owner of Nautilus and its chief executive officer. He continued with Nautilus until 2000, when, as did many entrepreneurs of the time, he looked to cyberspace.

Together with other managers from Nautilus and a firm specializing in new internet businesses, Ramig formed shoeS4Work, Inc. He was chief executive officer, a board member, and a minority shareholder. A "Key Employee Agreement" governed his work as chief executive officer and provided for a $150,000 annual salary.

ShoeS4Work had two stock classes: common and preferred. The preferred stock had a dividend preference and voting rights.

---

[3]The issues here involve John C. Ramig's activities. We refer to John C. and Margaret T. Ramig collectively as "the Ramigs" and refer to John C. Ramig as "Ramig".

By March 2002 there were 144,126 shares of common stock and 1,417,391 shares of preferred stock outstanding. Ramig held 40,000 shares of common stock directly, and he was a one-third owner of an entity named ShoNovation, which held 44,000 shares of common stock. He held no preferred stock.

ShoeS4Work's creators tried to use the internet to sell safety footwear--mainly steel-toe shoes. One of the company's strategies was to provide safety information on its website to attract customers. It is unclear whether shoeS4Work sold to employers or directly to workers.

The beginning of the millennium was not an easy time for internet companies, and shoeS4Work was no exception. From the start it constantly needed more capital. Although it raised nearly $1.5 million, at times it lacked the cash for payroll and other expenses.

In 2001 and 2002 Ramig made seven purported loans to shoeS4Work. The record contains seven promissory notes, each corresponding to one of the purported loans. It also contains eight checks documenting the payment of the proceeds of the supposed loans.[4] Most of the checks had the printed notation

_____

[4]There are eight checks and only seven notes because for one note, dated Aug. 10, 2001, there are two checks, which add up to the amount shown on the note. See table infra.

"Loan" on the memo line.[5]  Each note called for 12 percent interest and gave a date on which the note was immediately due and collectible.  Only two of the seven notes were signed.  Ramig signed those two notes as shoeS4Work's president and chief executive officer.  Ramig testified that he made the seven purported loans "in anticipation of being able to raise the capital to repay [himself] at some point in the future."  He testified that shoeS4Work repaid the first three notes (dated January 22, April 20, and May 1, 2001), which totaled $57,000, but did not repay the last four notes (dated July 20, August 10, and August 13, 2001, and March 5, 2002), which totaled $29,600.  Besides Ramig's testimony that the first three loans were repaid, there is no other evidence of repayment.  Under the circumstances, it is peculiar that Ramig did not have documentation from either his files or the files of shoeS4Work to corroborate his testimony.  This leads to the conclusion that shoeS4Work did not repay any of the loans.  The following table summarizes the seven purported loans:

---

[5]For one of the eight checks (No. 3665 for $15,000 dated July 23, 2001), the memo line is blank.  For two others (No. 3809 for $3,000 dated Mar. 5, 2002, and No. 3556 for $5,000 dated Jan. 22, 2001), the memo line contains the notation "Loan", but it is handwritten, not printed.

| Note Date | Note Amount | Maturity Date | Note Signed | Supposedly Repaid | Check No. | Check Amount | Check Date |
|---|---|---|---|---|---|---|---|
| 1/22/2001 | $5,000 | 10/31/2001 | No | Yes | 3556 | $5,000 | 1/22/2001 |
| 4/20/2001 | 2,000 | 10/31/2001 | No | Yes | 3592 | 2,000 | 4/20/2001 |
| 5/01/2001 | 50,000 | 10/31/2001 | Yes | Yes | 3604 | 50,000 | 5/02/2001 |
| 7/20/2001 | 15,000 | 10/31/2001 | No | No | 3665 | 15,000 | 7/23/2001 |
| 8/10/2001 | 6,600 | 10/31/2001 | No | No | 3674 | 6,000 | 8/10/2001 |
|  |  |  |  |  | 3675 | 600 | 8/10/2001 |
| 8/13/2001 | 5,000 | 10/31/2001 | No | No | 3676 | 5,000 | 8/13/2001 |
| 3/05/2002 | 3,000 | 3/15/2002 | Yes | No | 3809 | 3,000 | 3/05/2002 |

Ramig paid some of shoeS4Work's operating expenses, which included postage, office supplies, and some inventory purchases, with his credit card.  The expenses totaled $11,273.60.[6]  The Ramigs claim that the payments were loans to shoeS4Work and that it had repaid similar past advances.  But the record includes no documents substantiating that shoeS4Work either had agreed to repay the $11,273.60 or had repaid similar amounts in the past.

---

[6]The Ramigs claim that the total is $11,331.40.  But the amounts Ramig testified he paid on shoeS4Work's behalf add up to $11,273.60, $57.80 less than the Ramigs assert.  We therefore find that the payments totaled $11,273.60.

We also note that one of Ramig's credit-card statements shows a credit from Kingston McKnight--an inventory supplier for shoeS4Work--for $41.80.  Although Ramig testified that other entries on the credit-card statement for Kingston McKnight reflected advances of funds to shoesS4Work, he did not testify about the $41.80 entry.  The IRS did not present any evidence--or any argument--that the total should be reduced by the $41.80 entry.  Because the parties do not address this credit, we do not include it in the $11,273.60 that we find Ramig paid by credit card.

ShoeS4Work stopped operations in August 2002. It was unable to raise enough capital and never achieved profitability. Soon afterward, it liquidated most of its tangible assets including storage racks, inventory, and miscellaneous equipment. It used the proceeds to pay suppliers, but it did not pay Ramig.

The Ramigs claim that they made two other sets of payments connected with shoeS4Work. Between December 2002 and May 2005, they made payments to Puget Sound Leasing totaling $2,500.[7] And they claim to have paid General Motors Acceptance Corporation $2,500.

Shortly before shoeS4Work shut down, investor Jeannie Lay and her wholly owned company, Hecate, LLC, sued shoeS4Work. Her amended complaint named Ramig, shoeS4Work, and five other members of its board of directors as codefendants. She alleged that Ramig made misrepresentations to persuade her to invest in shoeS4Work and that shoeS4Work's board failed to supervise Ramig

_____

[7]The record includes 13 canceled checks to Puget Sound Leasing totaling $2,500. The IRS asserts that the Ramigs paid Puget Sound Leasing $2,500. The Ramigs assert in their reply brief that the correct total is $2,700, but this assertion is unsupported.

The parties stipulated the admissibility--but not the accuracy--of a spreadsheet, which is undated and does not reflect its authorship. The spreadsheet lists 14 checks purportedly written by the Ramigs to Puget Sound Leasing totaling $2,600. Check No. 4515--dated Jan. 24, 2005, for $100--appears on the spreadsheet but is not in evidence.

We find that the Ramigs paid $2,500 on the basis of the canceled checks in evidence.

adequately. Ramig prevailed in the suit but incurred legal fees, including $6,719.43 in 2004 and $6,573.58 in 2005.

ShoeS4Work sold its remaining assets in March 2004. The buyer, SR Footwear, a company in which Ramig was a minority owner, bought a few remaining tangible items and the major intangible assets such as two domain names; supplier agreements; and the shoeS4Work website, brand name, customer list, telephone numbers, and corporate records. The agreement contained a list of persons with liens on shoeS4Work's assets, but Ramig's name did not appear on the list.

In exchange for the assets, SR Footwear agreed to make contingent payments to shoeS4Work. For every month in which SR Footwear sold 5,000 or more pairs, it was to pay shoeS4Work 50 cents for each pair sold that month. Payment was to continue on these terms up to $100,000.

To operate SR Footwear, Ramig helped find two young executives, Andrew Macklin and Jason Lacey. The two men had degrees in mechanical engineering. Lacey had worked as a consultant at Accenture and at a startup named Greenwood Resources; Macklin had worked at General Electric. The two men handled finances, marketing, and day-to-day operations.

SR Footwear focused on different shoes and different customers. It sold primarily slip-resistant safety shoes, hence

the name, <u>SR</u> Footwear.  And instead of industrial workers, it sold primarily to hospitality and food-service workers.

SR Footwear reached agreements with a number of restaurant and coffeehouse franchises to sell shoes to their employees.  The employees could go to an SR Footwear website customized for the employer where they could place orders for shoes and pay through payroll withholding.

As it turned out, however, getting access to employees and getting those employees to buy were different problems.  SR Footwear's sales never reached the 5,000-pair threshold necessary to trigger a payment to shoeS4Work.  For that matter, the company never made a profit.

Lacey and Macklin saw two solutions to the lagging sales. First, they felt SR Footwear needed more marketing.  And second, they felt it needed to have a lower priced private-label shoe. They looked to the company's investors for more capital to address these issues.  The investors, however, balked.  And in response, the two men left:  Lacey in October 2005 and Macklin in April 2006.

On leaving, neither man held much hope for the company's future.  The investors had been clear that they would not supply the capital Lacey and Macklin felt SR Footwear needed.  And the investors replaced them with one person, who both men felt was

unqualified.  Ramig agreed with Lacey and Macklin's evaluation and believed their exit sealed the company's fate.

After Lacey and Macklin's departure, events surrounding SR Footwear are unclear; but by trial, it had stopped operations.

In 2004 Ramig returned to the practice of law as an employee of a Portland law firm.  Although in the past Ramig had received law-firm salaries through his wholly owned professional corporation, John C. Ramig, P.C., in 2004 and 2005 he received his law firm salary directly.

Meanwhile, during 2004 and 2005, Ramig apparently continued to own another company, Garfield Holdings, LLC, which in turn apparently owned a rental property in Arlington, Virginia.

Although the Ramigs' returns for 2004 and 2005 say that they were self-prepared, they were not.  The Ramigs had John Ramig's bookkeeper prepare their returns.  The bookkeeper was not a certified public accountant; Ramig originally hired her merely to enter information into accounting software.  One mistake the bookkeeper made is relevant here:  she did not report the purported rental-property expenses on the first page of the Form 1040, U.S. Individual Income Tax Return, for 2004.  Because of this error, the expenses did not affect the taxable income and tax liability reported by the Ramigs.

On September 5, 2008, the IRS issued a notice of deficiency for tax years 2004 and 2005.  The IRS determined deficiencies in

tax of $953 for 2004 and $22,114[8] for 2005.  The IRS also determined that the Ramigs were liable for penalties under section 6662(a) of $190.60 for 2004 and $4,442.80 for 2005.

OPINION

## I.  Deductions

The parties dispute three deduction issues.  First, for 2004 the Ramigs now claim they are entitled to deduct $8,781 for expenses of the rental property in Arlington, Virginia.  The Ramigs did not claim the $8,781 on their return, mention it in the petition, or mention it in their pretrial memorandum. Second, the Ramigs claim that they are entitled to deduct legal expenses of $6,719.43 for 2004 and $6,573.58 for 2005.  And third, for 2005 the Ramigs claim that they are entitled to deduct under section 166 the following amounts for worthless debts: (i) $29,600 for the unpaid principal of four purported promissory notes, (ii) $11,331.40 for expenses paid by credit card,[9] (iii) $2,500 they purportedly paid to General Motors Acceptance Corporation, and (iv) $2,700 paid to Puget Sound Leasing.[10]  As we explain below, the Ramigs are entitled to deduct the legal expenses but not the other disputed items.

---

[8]See *supra* note 1.

[9]The Ramigs, however, paid only $11,273.60, not $11,331.40. See *supra* note 6.

[10]The Ramigs, however, paid only $2,500 to Puget Sound Leasing.  See *supra* note 7.

A.    Burden of Proof

The Ramigs have the burden of proving that they are entitled to the disputed deductions.  Generally, the taxpayer has the burden of proving that the determinations in the notice of deficiency are wrong.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491(a)(1) shifts the burden of proof to the IRS if the taxpayer satisfies the conditions in section 7491(a)(2) and introduces credible evidence on factual issues relevant to the taxpayer's liability for a tax under subtitle A or B.  A taxpayer bears the burden of proving that the conditions in section 7491(a)(2) are satisfied.  See Higbee v. Commissioner, 116 T.C. 438, 440–441 (2001).  Because the Ramigs have neither contended nor adduced evidence that they satisfied these conditions, section 7491(a)(1) does not shift the burden of proof to the IRS.

B.    The Ramigs Are Not Entitled To Deduct Rental-Property
      Expenses for 2004.

The Ramigs claim that they are entitled to deduct $8,781 for the expenses of a rental property, which they say they held through Garfield Holdings, LLC.  They did not claim the deduction on the appropriate place on their return.  Nor did they raise the issue with the IRS at the administrative level, identify the issue in their petition, or move for leave to amend their petition under Rule 41.  Because the Ramigs neither raised the issue in their petition nor moved for leave to amend their

petition, we do not consider their entitlement to the rental-property expense deduction. See Rule 34(b)(4) (stating that taxpayers must include in their petitions "Clear and concise assignments of each and every error which [they allege] to have been committed by the Commissioner in the determination of the deficiency or liability" and that "Any issue not raised in the assignments of error shall be deemed to be conceded"); see also Funk v. Commissioner, 123 T.C. 213, 215-216 (2004). Our refusal to consider the issue is particularly justified because the issue is factual and the Ramigs first told the IRS they would raise it the day before trial. See Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975) (stating that refusing to hear an issue was especially justified because it was a factual issue and the IRS was not aware of it until trial).

The Ramigs claimed that the following sentence in the petition raises the issue: "Petitioners' [sic] further request that this Court grant such relief as the Court deems fit and appropriate herein." The Ramigs' counsel described the sentence as "a catch-all phrase", which he "always put[s] * * * in." It is not, however, a "clear and concise assignment" of an error by the IRS with respect to the $8,781 deduction. See Rule 34(b)(4). And it does not "enable ascertainment of the issues". See Rule 34(a)(1).

The Ramigs also argue that the IRS was not prejudiced because their Schedule E, Supplemental Income and Loss, reflected the rental-property expenses on line 22.  Although they concede that their bookkeeper erred by failing to carry the amount over to the first page of their Form 1040, they argue that the IRS should have realized that the bookkeeper made a mistake.  But the Ramigs not only failed to report that the expenses affected their tax liability; they failed to assert such a claim in audit or on appeal, and neither their petition nor their pretrial memorandum describes the issue.  Understandably, IRS counsel was unprepared to litigate the issue at trial.

We will not consider the rental-property expense deduction for 2004:  the Ramigs did not plead the issue and raised it for the first time at trial.

C.   The Ramigs Are Entitled To Deduct the Legal Fees Under Section 162(a).

The Ramigs claim that they are entitled to deduct, as ordinary and necessary business expenses, legal fees of $6,719.43 for 2004 and $6,573.58 for 2005.  These were the fees Ramig incurred to defend himself from a lawsuit by disgruntled shoeS4Work investor Jeannie Lay.  The IRS argues that the suit was against Ramig personally--not as chief executive officer of shoeS4Work--and that the expenses of defending the suit were therefore unrelated to the conduct of a trade or business.  As we explain, the Ramigs are entitled to the deductions.

Section 162(a) allows taxpayers to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Performing services as an employee can be a trade or business within the meaning of section 162. See, e.g., Biehl v. Commissioner, 118 T.C. 467, 477-478 (2002), affd. 351 F.3d 982 (9th Cir. 2003). A taxpayer may deduct litigation expenses incurred in defending a lawsuit if the suit "arises in connection with" or "proximately result[s] from" the taxpayer's business. United States v. Gilmore, 372 U.S. 39, 47-48 (1963). So the question is whether the legal fees arose from Ramig's business of performing services as an employee.

The basic test of whether legal fees incurred in defending a lawsuit arose from a taxpayer's business depends on whether the underlying legal claim originated from that business. O'Malley v. Commissioner, 91 T.C. 352, 361-362 (1988). If the legal claim arose from the taxpayer's business, the legal fees are deductible regardless of whether the taxpayer was still conducting that business when the fees were incurred. See Ostrom v. Commissioner, 77 T.C. 608, 613 (1981) (allowing deduction of expenses paid three years after the business stopped operating).

The claim against Ramig arose from his business of performing services for shoeS4Work as an employee. The complaint alleged that he, as chief executive officer of shoeS4Work, made misrepresentations and omitted facts about the company to

persuade Ms. Lay to buy shares.  It alleged that the other board members were liable because they "failed to reasonably, adequately, and properly supervise" his activities.  In Ostrom v. Commissioner, supra at 613, we found legal expenses of defending a claim deductible because the claim arose "from petitioner's misrepresentations of the company's financial status made while * * * performing his duties as president and general manager of the company."  Similarly, we find that the expenses here are deductible under section 162.

Thus under section 162, the Ramigs are entitled to deduct $6,719.43 for 2004 and $6,573.58 for 2005 as expenses of John Ramig's business of rendering services to shoeS4Work as an employee.

D.    The Ramigs Are Not Entitled to Bad-Debt Deductions.

The Ramigs claim that they are entitled to deductions for the worthlessness, in 2005, of the following four categories of purported debts owed by shoeS4Work to Ramig:  (i) the unpaid principal of four of the seven purported promissory notes in evidence, (ii) the expenses Ramig paid by credit card during 2002, (iii) a payment Ramig claims he made to General Motors Acceptance Corporation, and (iv) the payments Ramig made to Puget Sound Leasing.

Section 166(a)(1) allows a deduction against ordinary income for "debt which becomes worthless within the taxable year."  But

for individual taxpayers, section 166(a) (and therefore section 166(a)(1)) "shall not apply to any nonbusiness debt". Sec. 166(d)(1)(A). Thus individual taxpayers' nonbusiness debts are not deductible against ordinary income under section 166(a)(1) when they become worthless. Instead, section 166(d)(1)(B) treats an individual's worthless nonbusiness debts as short-term capital losses. Because we find that the advances were not debts, we need not determine whether the advances should be considered business debts (for which a deduction against ordinary income would be allowed to Ramig) or nonbusiness debts (for which a capital loss would be allowed to Ramig).

There is no bad-debt deduction without a bona fide debt. The regulations define a bona fide debt as one "which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. We determine whether a bona fide debtor-creditor relationship exists from all the pertinent facts. Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

The Court of Appeals for the Ninth Circuit, to which appeal of this case will lie,[11] has listed the following factors for determining whether an advance to a corporation gives rise to a

---

[11]Appeal of this case will be to the Court of Appeals for the Ninth Circuit, unless the parties otherwise agree. See sec. 7482(b)(1) and (2). We follow the law of the Court of Appeals to which an appeal will lie. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

bona fide debt as opposed to an equity investment: (i) the labels on the documents evidencing the (supposed) indebtedness, (ii) the presence or absence of a maturity date, (iii) the source of payment, (iv) the right of the (supposed) lender to enforce payment, (v) the lender's right to participate in management, (vi) the lender's right to collect compared to the regular corporate creditors, (vii) the parties' intent, (viii) the adequacy of the (supposed) borrower's capitalization, (ix) whether stockholders' advances to the corporation are in the same proportion as their equity ownership in the corporation, (x) the payment of interest out of only "dividend money", and (xi) the borrower's ability to obtain loans from outside lenders. A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970) (citing O.H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125-126 (9th Cir. 1960), affg. T.C. Memo. 1959-110). The list is not exclusive. See Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), affg. T.C. Memo. 1998-121. And no factor is determinative. See id.; see also John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946) ("There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments * * * or debts."); A.R. Lantz Co. v. United States, supra at 1333 ("When a lower court has overemphasized one of these factors, * * * [the Court of Appeals

for the Ninth Circuit] has consistently been disposed to reverse.").

> 1. The Ramigs Are Not Entitled to a Deduction for the Unpaid Principal of the Purported Promissory Notes.

The Ramigs gave evidence of seven purported loans from Ramig to shoeS4Work. They claim a bad-debt deduction of $29,600 for the unpaid principal of the last four purported loans Ramig made to shoeS4Work. Those four purported loans were: (i) the $15,000 purported loan, made on July 20, 2001; (ii) the $6,600 purported loan, made on August 10, 2001; (iii) the $5,000 purported loan, made on August 13, 2001; and (iv) the $3,000 purported loan, made on March 5, 2002.

The Ramigs have shown that John Ramig advanced the $29,600 to shoeS4Work. They introduced canceled checks for the advances from Ramig to shoeS4Work.

Having concluded that Ramig advanced the money, we turn to whether those advances gave rise to a bona fide debtor-creditor relationship. In doing so, we apply the factors listed by the Ninth Circuit in A.R. Lantz Co. v. United States, 424 F.2d at 1333, and we conclude that the advances were an equity investment.[12]

---

[12]The Ramigs did not argue that--and thus we do not consider whether--the advances were deductible other than as bad-debt deductions.

It is a sign of equity if the purported borrowing corporation is so thinly capitalized at the time of an advance that a business loss would make it unable to repay (the eighth factor). Hardman v. United States, 827 F.2d 1409, 1414 (9th Cir. 1987); Bauer v. Commissioner, 748 F.2d 1365, 1369 (9th Cir. 1984), revg. T.C. Memo. 1983-120. As the record does not reflect shoeS4Work's capitalization at the time of the advances, we consider this factor neutral.

Because of its financial condition, we believe shoeS4Work was unable to get outside financing (the eleventh factor), which suggests an equity investment. See Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 605 (1991) (citing Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968)) (stating that it suggests a bona fide debt if a corporation could have borrowed money from an outside lender at the time of an advance); see also Segel v. Commissioner, 89 T.C. 816, 828 (1987) ("the touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms"). The Ramigs did not present evidence that shoeS4Work could have borrowed money from outside lenders. Because of the Ramigs' failure to produce such evidence, shoeS4Work's failure to find more investors, and shoeS4Work's failing financial condition, we think it unlikely shoeS4Work could have borrowed the money from an outside lender. This factor therefore indicates equity.

The expected source by which shoeS4Work was to repay Ramig (the third factor) suggests that the advances were equity. In Am. Offshore, Inc. v. Commissioner, supra at 602, we found that the source of payments suggested the investment was equity because the parties appeared to expect repayment only if the purported borrower was financially able to do so and the purported borrower showed steady losses from operations along with steadily declining inventory and assets. Here the parties expected repayment only if shoeS4Work raised more capital. And, as in Am. Offshore, Inc., shoeS4Work was on a downward track with a history of steady losses.

More importantly, the parties' treatment of the advances suggests equity investment. Equity participants take a subordinate position to creditors regarding payment on liquidation: they get paid last. Hardman v. United States, supra at 1413. So taking a subordinate position to other creditors (the sixth factor) may suggest that the purported lender is really an equity investor. See CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16. The notes say neither that they are senior nor that they are junior to other obligations. But Ramig did not demand timely repayment and thus treated his claim as subordinate to the rights of the creditors that were paid first. See Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281 (finding that a similar failure cast doubt on the

original intent to create a debtor-creditor relationship), affd. without published opinion 770 F.2d 1071 (3d Cir. 1985). If a purported lender is to be paid interest out of only "dividend money" (the tenth factor), it indicates equity. And if the supposed lender subsequently fails to insist on the remittance of interest payments when due, it suggests that, at the time of the advance, the supposed lender expected repayment from so-called dividend money. See Am. Offshore, Inc. v. Commissioner, supra at 605. The Ramigs gave no evidence that shoeS4Work ever paid interest or that Ramig ever requested that shoeS4Work actually pay interest. "[A] true lender is concerned with interest." Curry v. United States, 396 F.2d at 634 (5th Cir. 1968). And Ramig has shown no such concern.

Three factors point to characterizing the advances as debt but are entitled to little weight under the circumstances. First, it is a sign of debt if the documents are enforceable (the fourth factor). CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16 (citing Estate of Mixon v. United States, 464 F.2d 394, 405 (5th Cir. 1972)). But Ramig never tried to enforce the notes, and three of the four notes for which the Ramigs claim deductions are unsigned--calling enforceability in question. Second, the purported promissory notes have fixed maturity dates[13]

---

[13]A "maturity date" is "The date when a debt falls due, such as a debt on a promissory note or bond." Black's Law Dictionary
(continued...)

(the second factor), indicating debt.  See <u>Hardman v. United States</u>, 827 F.2d at 1413.  But Ramig and shoeS4Work completely ignored the dates; we give this factor the same weight they did. Third, the documents' labels (the first factor) suggest debt. See <u>id.</u> at 1412 (stating that a debenture or note suggests debt). But the labels are mere formalities chosen by Ramig, who was on both sides of the transaction.  Because the Ramigs have not shown that these formalities ever had nontax significance, we give them little weight.

Two remaining factors point to debt.  The parties' expressions of intent (the seventh factor) suggest debt.  But such objective expressions of intent--as opposed to the parties' true or subjective intent--are "generally not to be afforded special weight."  <u>A.R. Lantz Co. v. United States</u>, 424 F.2d at 1333.  Said another way, the objective expression of intent is merely one factor in determining the parties' true intent. Second, the advances in question were not made in proportion to Ramig's equity interest (the ninth factor), which suggests debt.

Evaluating all the facts and circumstances, we conclude that the advances were equity investments, not loans.  As discussed above, four factors point to equity investment and five point to

---

[13](...continued)
452 (9th ed. 2009) (defining "date of maturity").

debt.[14] But the determination of debt or equity is no mere counting of factors. Bauer v. Commissioner, 748 F.2d at 1368 (9th Cir. 1984). And as we have explained, here three of the factors that indicate debt are entitled to little weight. Thus the other two factors pointing to debt do not outweigh the factors pointing to equity. We conclude that the Ramigs did not show that the advances were bona fide debts and are therefore not entitled to bad-debt deductions under section 166.

2. The Ramigs Are Not Entitled to a Deduction for Payment of Expenses by Credit Card in 2002.

The second category of purported debt for which the Ramigs claim bad-debt deductions for 2005 is for expenses Ramig paid by credit card.[15] They claim that although he did not make the payments directly to shoeS4Work, he incurred these expenses on the company's behalf and it agreed to reimburse him. But they offered no documents substantiating the agreement to repay. And although there can be a valid debt between related parties "without the formalities of a note", see Green Leaf Ventures,

_____

[14]Our discussion does not address the fifth factor, the purported lender's right to participate in management, because we do not have evidence of whether Ramig increased his management participation because of the advances. See CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16 (stating that an increase in management participation suggests equity investment). Thus this factor is neutral.

[15]The Ramigs assert that they are entitled to a bad-debt deduction for $11,331.40 of credit card expenditures purportedly paid on shoeS4Work's behalf. They have given evidence of only $11,273.60 of expenses. See supra note 6.

Inc. v. Commissioner, T.C. Memo. 1995-155, as we explain below, the Ramigs did not show that a valid debt existed.

Several factors related to the purported arrangement's terms indicate that the payments were equity, not debt. First, there was no repayment date (the second factor), which suggests that repayment--if expected--was "tied to the fortunes of the business", indicating an equity investment. Hardman v. United States, 827 F.2d at 1413. Second, if repayment depends on earnings or is to come from a restricted source (the third factor), it suggests equity. See CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16; see also Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287-288 (1990). Ramig testified that shoeS4Work was to pay as "funds were available", indicating the payments were equity. Third, "a true lender is concerned with interest" (the tenth factor). Curry v. United States, 396 F.2d at 634 (5th Cir. 1968). And here we have no indication Ramig insisted on--or for that matter even requested--interest, indicating the payments were equity. Fourth, the Ramigs have failed to show that Ramig had a right to enforce payment (the fourth factor), indicating equity. Cf. Am. Offshore, Inc. v. Commissioner, 97 T.C. at 603 ("A definite obligation to repay the advance is an * * * [indicator] of a loan."). Fifth, we do not have documentary evidence of Ramig's status in relation to other creditors (the sixth factor). But again, by never demanding

repayment, Ramig effectively subordinated his rights to the rights of other creditors, indicating equity.  See id.

As with the purported promissory notes, shoeS4Work's financial condition suggests an equity investment.  The Ramigs gave no evidence that similar loans were available from outside lenders (the eleventh factor), indicating equity.

Evaluating all the facts and circumstances, we conclude that Ramig and shoeS4Work did not have a bona fide debtor-creditor relationship regarding the credit card payments.  Of the factors listed by the Ninth Circuit in A.R. Lantz Co. v. United States, 424 F.2d at 1333, only the ninth factor suggests debt:  the payment of expenses by credit card was not in proportion to Ramig's equity interest.  See supra part I.D.1.  The remaining factors, however, point to equity or are neutral.[16]  And although the Ramigs claim shoeS4Work repaid similar past advances, they did not give evidence--aside from Ramig's testimony--of either

---

[16]The lender's right to participate in management (the fifth factor) is neutral because, again, we do not have evidence of whether Ramig increased his management participation after the advances.  See supra note 14.  The parties' objective expression of intent (the seventh factor), is also neutral.  The only expression of intent about these payments is Ramig's testimony. In Am. Offshore, Inc. v. Commissioner, 97 T.C. 579 (1991), we found that the taxpayer's mere statements that the parties intended the advances to be loans were not enough to persuade us that this factor suggested debt.  Id. at 604.  We do not have evidence of shoeS4Work's capitalization (the eighth factor).  See supra part I.D.1.  And the first factor, the labels on the documents, is neutral because there are no loan documents.  See Am. Offshore, Inc. v. Commissioner, supra at 602.

past repayments or similar past advances. Because they did not show a genuine debtor-creditor relationship, the Ramigs are not entitled to a deduction under section 166.

> 3. <u>The Ramigs Are Not Entitled to a Deduction for Payment to General Motors Acceptance Corporation</u>.

The third category of purported debt for which the Ramigs claim bad-debt deductions is a debt, supposedly owed by shoeS4Work to the Ramigs, arising from the Ramigs' purported payment of $2,500 to General Motors Acceptance Corporation. The only evidence that the payment was made was Ramig's testimony.

We reject his testimony for two reasons. First, no other evidence corroborates the testimony. Second, the Ramigs' brief contradicts the testimony. Ramig testified that shoeS4Work bought a van to make deliveries in the Portland area and that after shoeS4Work failed, he found out that he was responsible for the payments and sold the van. He testified that the $2,500 is the difference between "the amount that was due under the purchase contract" and the sale proceeds. The Ramigs' brief, on the other hand, states that this payment is related to a lease.

Thus we conclude that the Ramigs did not pay the $2,500, and the Ramigs have therefore failed to demonstrate the existence of a bona fide debtor-creditor relationship.

4.    The Ramigs Are Not Entitled to a Deduction for Payments to Puget Sound Leasing.

The final category of purported debt for which the Ramigs claim a bad-debt deduction in 2005 supposedly arose from Ramig's payments to Puget Sound Leasing.  Ramig paid Puget Sound Leasing $2,500 between December 2002 and May 2005.  The Ramigs claim that he paid these amounts as guarantor of shoeS4Work's equipment leases.

Section 1.166-9, Income Tax Regs., generally treats payments in discharge of part or all of a taxpayer's obligations under a guaranty agreement as debts becoming worthless in the year of payment.  See sec. 1.166-9(a), Income Tax Regs. (applying to agreements made in the course of the taxpayer's trade or business); sec. 1.166-9(b), Income Tax Regs. (applying to agreements not made in the course of the taxpayer's trade or business).  The taxpayer must, however, demonstrate that the payment was in discharge of an obligation as a guarantor.  See Brodsky v. Commissioner, T.C. Memo. 2001-240.

The Ramigs did not show that the $2,500 was paid to discharge an obligation as a guarantor.  The canceled checks substantiate that Ramig paid $2,500 to Puget Sound Leasing, but not that he paid under a guaranty agreement.  Three of the thirteen checks refer to shoeS4Work in the memo line, but the notations are inconsistent with each other:  one says "Loan to S4W", one says "S4W", and one says "Payment of S4W Lease".  And

the Ramigs neither offered the agreement into evidence nor attempted to explain its absence. Considering all the evidence, they have not shown that the payments were in discharge of an obligation as a guarantor.

The Ramigs are therefore not entitled to deduct the $2,500 paid to Puget Sound Leasing.

II. Penalties

A. Burden of Proof

The IRS has the burden of producing evidence that taxpayers are liable for penalties. Sec. 7491(c). The IRS satisfies its burden by producing "sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. at 446. Once the IRS satisfies its burden of production, taxpayers have the burden of persuading the fact finder that they are not liable for the penalty. Id. at 446–447. The taxpayer bears the burdens of production and proof as to whether an exception to the penalty applies. See id. at 446 (stating that the IRS "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions").

B. The Ramigs Are Liable for the Accuracy-Related Penalty Under Section 6662(a).

Section 6662(a) imposes a penalty equal to 20 percent of the part of an underpayment attributable to (i) negligence or disregard of rules or regulations or (ii) a substantial understatement of income tax. Sec. 6662(a) and (b)(1) and (2).

The IRS determined that the Ramigs were liable for penalties under section 6662(a).  Because we find that the Ramigs' underpayment is attributable to negligence or disregard of rules or regulations, we do not address whether it is also attributable to a substantial understatement of income tax.

Negligence, for section 6662 purposes, is the lack of due care or the failure to do what a reasonably prudent person would do under like circumstances.  Hofstetter v. Commissioner, 98 T.C. 695, 704 (1992); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  And negligence includes failing "to make a reasonable attempt to comply with the provisions of the internal revenue laws".  Sec. 1.6662-3(b)(1), Income Tax Regs.; see also sec. 6662(c).

The IRS has met its burden of production for negligence.  The Ramigs had an unlicensed bookkeeper prepare their 2004 and 2005 returns, and when asked whether he believed the returns were accurate when he signed them--as self-prepared--Ramig testified that he merely assumed that they were accurate.  He relied on his bookkeeper and made no effort to verify that the returns complied with "the provisions of the internal revenue laws".  See sec. 1.6662-3(b)(1), Income Tax Regs.  The Ramigs' minimal effort to ensure compliance is far less than what a reasonably prudent person would do under like circumstances.  Thus the IRS has given sufficient evidence that it is appropriate to impose the section 6662(a) penalty on the entire underpayment for each year.

The section 6662(a) penalty has several exceptions.  A position with a reasonable basis is not due to negligence.  Sec. 1.6662-3(b)(1), Income Tax Regs.  And no penalty is imposed on a part of the underpayment if the taxpayer (i) had reasonable cause for and (ii) acted in good faith regarding that part of the underpayment.  See sec. 6664(c); sec. 1.6664-4, Income Tax Regs.

The Ramigs have failed to prove that they are not liable for the section 6662(a) penalty.  And they have neither argued nor offered evidence that an exception excuses them from the penalty. We therefore uphold the IRS's determination that the Ramigs are liable for the section 6662(a) penalty of 20 percent of the underpayments for 2004 and 2005.

III. Summary

The Ramigs are entitled to deduct legal expenses of $6,719.43 for 2004 and $6,573.58 for 2005.  They are not entitled to bad-debt deductions for (i) the advances paid to shoeS4Work related to the purported promissory notes because they failed to show a genuine debtor-creditor relationship; (ii) the credit card expenditures because they failed to show a genuine debtor-creditor relationship; (iii) the amount purportedly paid to General Motors Acceptance Corporation because they failed to show

that they paid the amount; and (iv) the amounts paid to Puget Sound Leasing because they failed to substantiate that the payments were in discharge of Ramig's obligation as a guarantor.

The Ramigs are liable for the section 6662(a) penalty for each year.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.