T.C. Memo. 2011-174

UNITED STATES TAX COURT

THOMAS JAMES KAIDER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24621-08.             Filed July 20, 2011.

<u>Jonathan P. Decatorsmith</u> and Kristen Smith (student), for
petitioner.

<u>J. Spencer Hitt</u> and <u>Mayer Y. Silber</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  Respondent (the IRS) issued a notice of
deficiency for the tax year 2006 to Thomas James Kaider
determining an income-tax deficiency of $16,529 and a section

6662(a)[1] accuracy-related penalty of $3,306.  The IRS now concedes that Kaider's income-tax deficiency for 2006 should be reduced to $3,676 and that Kaider is not liable for the section 6662(a) penalty.  The IRS's initial determination was based on a Form 1099-MISC, Miscellaneous Income, reporting that Kaider received $58,500 of nonemployee compensation in 2006.  The parties now stipulate that Kaider received only $21,500 of the $58,500 in 2006.  The $21,500 came in the form of four personal checks from his uncle, Edward Quinn (Quinn).  At issue is whether the four checks were loans or compensation for services.  We find that they were loans.

## FINDINGS OF FACT

We adopt the stipulation of facts.  Kaider resided in Illinois when he filed the petition.

1.  Before Kaider's Move to Florida

Kaider suffered a stroke in college, leaving him paralyzed from the chest down.  After college, he started Pride Pavement Striping, Inc.  Quinn lent him $10,000 for Pride Pavement Striping in 2003, which he repaid with interest.

---

[1]All section references are to the Internal Revenue Code as in effect for the year in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

2.   <u>Kaider's Move to Florida and His June 27, 2005 Agreement
     With Quinn</u>

In June 2005, Kaider went to Florida for vacation and stayed

with Quinn.  The two eventually discussed business, and Kaider's

computer knowledge impressed Quinn,[2] who thought those skills

could help him with a personal issue and with litigation

involving a corporation he co-owned (Mill-It Corp.).  Quinn asked

Kaider to stay in Florida and work with him.  Kaider wrote the

following letter in response:

Uncle Ed,

This is as concise as I can make it:

Offered Services:
  • Me

Desired Compensation:
  • Adventure
  • Belonging
  • Responsibility for important affairs
  • Approval of frequent visitation from my loved ones
  • To learn everything you know about business

-Tommy

Afterward, Quinn offered Kaider an "internship" (i.e., a business

mentoring opportunity).  A modified, signed version of Kaider's

letter (the June 27, 2005 agreement) formalized their

---

[2]Kaider had only conventional computer skills, but Quinn was
not technologically savvy.

arrangement.[3]  Kaider decided to stay in Florida permanently.  He lived at Quinn's house until he bought a home in early 2006.

3.  Kaider's Activities in Florida

From June 2005 to June 2006, Kaider (a) socialized with family and friends; (b) assisted Quinn with his personal affairs; (c) assisted Quinn with Mill-It By Quinn, Inc., which was largely dormant in 2006; (d) assisted Quinn with Mill-It By Kaider-Quinn, Inc., which was largely dormant in 2006; and (e) assisted Quinn with Gym World, Inc.  During this time, Quinn paid Kaider's personal expenses, and Kaider received the following payments: (1) $200 from Mill-It By Quinn in 2005, (2) $37,000 from Quinn in 2005, (3) $6,000 from Gym World in 2006, and (4) $21,500 from Quinn in 2006.  At issue is the character of the $21,500 from Quinn in 2006.

a.  Social Activities

Kaider spent much of his time in Florida socializing with family and friends.  Quinn paid most of Kaider's living expenses and let Kaider stay at his house.  Although Kaider moved out of Quinn's house in February 2006, Quinn continued paying Kaider's living expenses until May or June 2006.

----

[3]Quinn had typed up the letter, dated it June 27, 2005, and added two signature lines with his and Kaider's names underneath and bearing the heading "approved and agreed upon".

b.    Assistance With Quinn's Personal Affairs

Kaider characterized much of his initial activity in Florida as trying to "wrangle in Charlene".  Charlene, Quinn's girlfriend and future wife, was apparently traveling the country using his credit cards.  Kaider acted as a "private investigator", checking Quinn's credit card statements and tracking Charlene with a global positioning system device.  This activity continued until Charlene's return in July 2005.

Kaider later helped Quinn streamline his personal finances. He balanced Quinn's checkbook, converted Quinn's financial statements to electronic form, and printed financial reports with QuickBooks, a type of accounting software.  Kaider testified that he usually printed the QuickBooks reports once a month and added a simple coversheet with "some clip art".  Over 6 to 8 months, he spent 1 hour and 15 minutes compiling the reports.[4]  It seems Quinn was extremely pleased:  he testified that the reports were "very nicely done graphs, charts" showing "good workmanship" and "splitting out different things".  But after examining the reports, we do not believe they required much skill or effort.

Kaider also helped Quinn manage daily household expenses. For example, he ensured that checks reached their intended

---

[4]The first report took about 1 hour because Kaider had to enter in the baseline data, which he did while watching TV. Later it took "literally 60 seconds each" to produce new reports: he merely entered updated numbers and printed the report.

recipients and were properly recorded, and he supervised workers renovating or repairing the house. Kaider estimated that he spent "45 minutes every other day" assisting Quinn with various tasks.[5] We believe this assistance extended into 2006.

    c.    <u>Mill-It Corp. and Mill-It By Quinn, Inc.</u>

Several decades ago, Quinn started Mill-It Corp., which recycled roads and runways.[6] He later brought in two partners, Guzman and Bortells, to help run the company.

In May 2005, Quinn started Mill-It By Quinn, Inc., with his children--Eddie Quinn (Eddie) and Kacey Quinn (Kacey). He envisioned it as a business similar to Mill-It Corp. But Mill-It By Quinn did not engage in significant operations in 2005 and 2006; much of its work consisted of conversations between Quinn, Eddie, and Kacey. Around October 2005, Eddie and Kacey had a falling out with Quinn and left the company.

In 2005, Quinn's Mill-It Corp. partners (Guzman and Bortells) sued over Quinn's right to use the name "Mill-It By Quinn" (among other issues). Quinn testified that the litigation severely hindered Mill-It By Quinn's operations because a court order prevented him from using the name "Mill-It By Quinn".

_____

[5]If Quinn paid Kaider's living expenses in exchange for his assistance, Kaider may have had additional unreported income. The IRS did not raise this issue, so we do not address it.

[6]The company ground road materials into small nuggets--a process called milling--then melted and reprocessed the nuggets before laying the recycled materials in roads.

Quinn finally prevailed in late 2007, and Mill-It By Quinn was operating at the time of trial.

To help with the lawsuit, Kaider prepared a three-page graphical representation using Mill-It Corp.'s tax returns from 1988 to 2003. The compilation showed the company's income during that period and detailed the three partners' earnings. Its purpose was to show that Quinn had been fair and had given his partners a "very healthy salary". The document was ultimately used in the litigation. It took Kaider, Eddie, and Kacey 10 hours to make the compilation on one day in June 2005.

Kaider also assisted with Mill-It By Quinn's startup activities. He helped design a logo, a business card, and a T-shirt. He taught Eddie and Kacey how to use QuickBooks. And he attended a function at the Roadbuilders Association, which he described as "a volleyball, eating, drinking sort of event".

The parties stipulated that Mill-It By Quinn paid Kaider $200 in wages in 2005. This payment was recorded on a paystub.[7] There were no paystubs for 2006.

---

[7]Another paystub reflects a second $200 wage payment to Kaider, but other evidence suggests that he did not receive the second $200. Thus we do not disturb the stipulation that Kaider received only $200 in wages from Mill-It By Quinn in 2005.

d.   Mill-It By Kaider-Quinn, Inc.

In July 2005, Kaider, Quinn, Eddie, and Kacey started Mill-It By Kaider-Quinn, Inc.[8]  Quinn anticipated that the company would secure disadvantaged-business-enterprise status on the basis of Kaider's disability, procure contracts from the State of Florida, and subcontract work to Mill-It By Quinn. However, the company never began operations.  As Kaider testified, the business idea was the product of "a one-day conversation", and the company "never did anything".[9]  When Quinn, Eddie, and Kacey had their falling out, Quinn asked Kaider to continue Mill-It By Kaider-Quinn with him.  Kaider refused. He was not interested in milling and did not want his cousins to hate him.[10]

e.   Gym World, Inc.

For 14 years, Quinn exercised at a gym operated by Turner Health & Fitness, Inc.  Quinn had lent the company over $700,000 and had developed some sort of partnership arrangement with it by

---

[8]The stipulation of facts incorrectly states that the articles of incorporation for Mill-It By Kaider-Quinn were filed on July 25, 2009.  The articles were actually filed on July 25, 2005.

[9]On Sept. 15, 2005, Kaider amended Mill-It By Kaider-Quinn's articles of incorporation to remove Quinn, Eddie, and Kacey as officers.  The record does not explain the reason for or significance of doing so.

[10]The timeline of events for Mill-It By Kaider-Quinn is unclear.  Quinn's involvement with the company may have ended when Kaider removed him as an officer, see supra note 9, or when his falling out with Eddie and Kacey occurred.

2006. In May 2006, Quinn and Kaider ousted Mike Turner, the president of Turner Health & Fitness, from gym operations. Quinn gave Turner's responsibilities to Kaider, who worked at the gym for 35 to 40 days. Quinn formed Gym World, Inc., to take over the gym, and it paid Kaider $6,000 in wages in 2006, which it reported on a Form W-2, Wage and Tax Statement.

Despite the successful removal of Mike Turner, Gym World faced insurmountable problems. It had trouble succeeding to leases, membership agreements, and rights to membership fees. The gym rapidly lost money. Quinn paid its operating expenses for a while but eventually abandoned the venture. Quinn was deeply dissatisfied with Kaider over the episode.

f.   The Alleged Loans From Quinn

i.   The Checks

From 2005 to 2006, Kaider received 10 checks from Quinn totaling $58,500:

| Date | Check No. | Amount |
| --- | --- | --- |
| 7/22/2005 | 5308 | $5,000 |
| 8/30/2005 | 5313 | 12,000 |
| 9/29/2005 | 5346 | 5,000 |
| 11/04/2005 | 10031 | 5,000 |
| 11/30/2005 | 10062 | 5,000 |
| 12/21/2005 | 10079 | 5,000 |
| 1/17/2006 | 10123 | 5,000 |
| 2/27/2006 | 10116 | 5,000 |

| 3/28/2006[1] | 10158 | 5,000 |
| 4/26/2006 | 10182 | 6,500 |
| Total | | 58,500 |

[1]The stipulation of facts incorrectly lists Mar. 20, 2006 as the date of this check.

All 10 checks were signed by Quinn and drawn from Quinn's personal checking account.  The first three checks (July 22, August 30, and September 29, 2005) were handwritten.[11]  The other seven checks were computer-generated (except for Quinn's signature) using a template that Kaider designed.  The word "loan" was in the memo line of all 10 checks.[12]  Kaider deposited each check into his personal bank account.

ii.  The Loan Agreements

The record contains 10 loan agreements between Kaider and Quinn.  The dates and amounts on the loan agreements correspond to the 10 checks that Quinn gave Kaider from 2005 to 2006.[13] Each loan agreement provided that Quinn would lend Kaider the amount stated on the corresponding check at 6 percent annual interest, and that the full amount plus interest would be due

---

[11]A "handwritten" check refers to a standard preprinted check that was filled in by hand.

[12]"Loan" was handwritten on the handwritten checks and typewritten on the computer-generated checks.

[13]The loan agreements were sometimes dated the same day as the corresponding check, sometimes before, and sometimes after. Each loan agreement was typically dated within a few days of the corresponding check, with the largest gap being 8 days.

five years from the date of the agreement.[14]  Each loan agreement also provided that the debt could be paid partially or fully at any time without penalty, and that the agreement could be renewed at the discretion of Quinn and Kaider.  All loan agreements in the record bear Kaider's signature, but only the July 22, 2005 agreement contains both men's signatures.[15]

g.    The Rift With Quinn and the June 29, 2006 Fax

Around June 2006, family members held an "intervention" to break Quinn's drug habit.  Kaider's refusal to participate in the intervention upset Quinn.  On June 29, 2006, Quinn sent the following fax to Kaider:

Tommy,

This can be subjective but in reality you're fired.
But I am your uncle and I love you.  Please release all
my data passwords and information computers copiers
files etc in tact [sic].  Do not lose any information
during transition or transport.  If needed, I can
supply an enclosed environmentally friendly trailer

---

[14]There is one exception.  The loan agreement dated Feb. 28, 2006 uses the date of the check, not the date of the agreement, to determine the due date for repayment.  Thus the agreement states that repayment is due on Feb. 27, 2011--five years from the date of the check.

[15]The IRS disputes that Quinn signed the July 22, 2005 loan agreement.  We find that he did.  First, the signature on the agreement is similar to Quinn's signature on other documents. Second, Kaider testified that the signature was Quinn's; he recognized the signature because he had seen Quinn's checks when he helped manage Quinn's household expenses.  See supra pt. 3.b. Quinn testified that he did not sign the July 22, 2005 loan agreement, but we do not believe him.

with generator and backup power support to prevent any
loss of data and information.

Edward T. Quinn [signed]

Kaider interpreted the fax to mean he was relieved of his duties at the gym.  He stopped working there and ceased contact with Quinn.  For the rest of his time in Florida, Kaider paid his living expenses with a combination of leftover money from Quinn and income from various side jobs.[16]  He moved back to Illinois in late 2006.

4.   The Form 1099-MISC

In 2007, Mill-It By Quinn filed a Form 1099-MISC with the IRS.  The form reported that Mill-It By Quinn paid Kaider $58,500--the sum of the "loan" checks--in nonemployee compensation in 2006.  It is unclear how the Form 1099-MISC came to be filed.  Quinn testified that he did not know who had filed the form.  Kaider testified that he was not aware of the form until the IRS audited his return.

5.   Mill-It By Quinn's 2006 Tax Return

Mill-It By Quinn filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for 2006.  It did not claim deductions for wages, officer compensation, or nonemployee compensation.  It did not deduct (or otherwise report) the $58,500 of nonemployee compensation reported on Kaider's Form 1099-MISC.

---

[16]Kaider did not report the income from his side jobs on his 2006 tax return.  The IRS does not assert that Kaider is taxable on this income.

Quinn expressed dissatisfaction with Kaider over Mill-It By Quinn's 2006 tax return, even though Kaider no longer worked for Quinn when the return was filed. Quinn testified that he paid Kaider, Eddie, and Kacey for services rendered to Mill-It By Quinn. He declared that Kaider's Form 1099-MISC was "not a proper 1099"[17] and that he was working on filing proper Form 1099s and amended tax returns for 2005 and 2006 that would reflect the payments to Kaider, Eddie, and Kacey.

6.   Kaider's 2006 Tax Return

Kaider filed a Form 1040, U.S. Individual Income Tax Return, for 2006. He reported $6,000 in wages from Gym World. He did not report any income from Quinn, Mill-It By Quinn, or Mill-It By Kaider-Quinn. He did not report the $21,500 in checks he received from Quinn in 2006.

OPINION

I.   The Parties' Positions

From 2005 to 2006, Kaider received 10 checks from Quinn totaling $58,500. Four of the checks--totaling $21,500--were received in 2006.[18] None of the four checks were reported on Kaider's 2006 tax return. The IRS claims that the four checks were compensation for services to Mill-It By Quinn and should

---

[17]Quinn testified that the Form 1099-MISC was improper because it was unauthorized and because Mill-It By Quinn never claimed a deduction for the $58,500 reported on the form.

[18]The IRS concedes that the other six checks--totaling $37,000--were received in 2005, a year not in issue.

have been included in income.  Kaider asserts that the checks were loans from Quinn and thus not includable in income.

## II.  Burden of Proof

Generally, the taxpayer has the burden of proving the IRS's determination of deficiencies incorrect.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In some instances, section 7491(a) imposes the burden of proof on the IRS.[19]  Kaider argues that the IRS has the burden of proving the checks were not loans because, he claims, he introduced credible evidence that the checks were loans.  We do not address the allocation of the burden of proof because, as we explain, we find that Kaider has shown by a preponderance of the evidence that the four checks totaling $21,500 were loans.[20]

## III.  Whether the Four Checks Totaling $21,500 Were Loans or Compensation for Services

The taxability of the checks depends on whether they were loans or compensation for services.  Compensation for services is included in gross income.  Sec. 61(a)(1).  Money received under a loan, however, is not included in gross income because it is

---

[19]Sec. 7491(a) imposes the burden of proof on the IRS for a factual issue affecting tax liability if the taxpayer introduces credible evidence regarding the issue, meets substantiation and recordkeeping requirements, and cooperates with "reasonable requests" from the IRS.  See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

[20]The IRS has conceded that it has the burden of production. See sec. 6201(d).  We need not determine whether the IRS has satisfied its burden.

offset by an obligation to repay. Commissioner v. Tufts, 461 U.S. 300, 307 (1983). A bona fide loan exists only if both parties have an actual, good faith intent to establish a debtor-creditor relationship when the funds are advanced. Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970); Beaver v. Commissioner, 55 T.C. 85, 91 (1970). An intent to establish a debtor-creditor relationship exists if the debtor intends to repay the loan and the creditor intends to enforce repayment. Fisher v. Commissioner, supra at 909-910; Beaver v. Commissioner, supra at 91.

Courts consider various factors to determine whether parties intended a bona fide loan; no single factor is dispositive. See, e.g., Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), affg. T.C. Memo. 1998-121; Frierdich v. Commissioner, 925 F.2d 180, 182 (7th Cir. 1991), affg. T.C. Memo. 1989-393. In determining whether the checks were loans, we examine the following factors as evidence of Quinn and Kaider's intent:

    (1) the ability of the borrower (Kaider) to repay;

    (2) the existence or nonexistence of a debt instrument;

    (3) security, interest, a fixed repayment date, and a repayment schedule;

    (4) how the parties' records and conduct reflect the transaction;

    (5) whether the borrower has made repayments;

    (6) whether the lender (Quinn) has demanded repayment;

(7) the likelihood that the loans were disguised compensation for services; and

(8) the testimony of the purported borrower and lender.

See Welch v. Commissioner, supra at 1230-1231 (ability to repay, existence of instrument, security, interest, repayment schedule, actual repayments, demands for repayment, parties' records and conduct, and testimony of purported borrower considered in determining whether unexplained bank deposits were loans or taxable income); Frierdich v. Commissioner, supra at 182-185 (ability to repay, existence of instrument, security, interest, repayment date, repayment schedule, actual repayments, likelihood that loans were disguised compensation, and testimony of purported borrower considered in determining whether a lump-sum payment was a loan or an advance of attorney's fees); Mann Constr. Co. v. Commissioner, T.C. Memo. 1999-183 (listing factors considered, including demands for repayment and parties' records, in determining whether advances made to the son of a close corporation's president were bona fide debt for purposes of a section 166 bad debt deduction).

A.    The Ability of the Borrower To Repay

If the borrower was unable to repay when the funds were advanced, it suggests that the parties did not intend a bona fide loan.  See, e.g., Commissioner v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963), affg. 36 T.C. 446 (1961).  Courts assess the borrower's ability to repay by evaluating whether there was "a

reasonable expectation of repayment in light of the economic realities of the situation." Fisher v. Commissioner, supra at 910. The IRS analogizes Kaider's situation to that of the taxpayer in Fisher, who was insolvent when the funds were advanced. The taxpayer in Fisher owed another private creditor nearly $27,000; he had federal tax liens of $76,340 outstanding against him; the mortgage on his home had been foreclosed; and his only assets consisted of furniture valued at $2,000 and an insubstantial amount of cash. Id. at 910-911. The Court found there was no reasonable expectation of repayment. Id. at 911.

In 2006, Kaider had few assets. And he had substantial debts: a $200,000 home mortgage (by his estimate), a $37,000 previous debt to Quinn (assuming the six checks in 2005 were loans), and a $300 overdraft protection line of credit on which he owed varying amounts each month. He also had no reliable source of future earnings. However, Kaider and Quinn reasonably expected that some of Quinn's startup enterprises would become profitable and enable Kaider to repay his loans within a five-year period.[21] Quinn had told Kaider: "We're going to get something going down here and you're going to have all the money

---

[21]Kaider's obligation to repay was not contingent on the success of a startup enterprise. In Mann Constr. Co. v. Commissioner, T.C. Memo. 1999-183, we held that a son had valid and enforceable debt when he borrowed money from his father's company, which had claimed a sec. 166 bad debt deduction. Even though the son expected to repay primarily through future employment with the company, his obligation to repay was not limited to his future earnings from the company. Id.

in the world and you can pay me back."  The delays in starting

Mill-It By Quinn and the failure of Mill-It By Kaider-Quinn did

not render the expectation unreasonable:  Quinn, a self-made

millionaire, had already proven himself a successful

entrepreneur.[22]

B.    The Existence or Nonexistence of a Debt Instrument

The existence of a debt instrument suggests that the parties

intended a bona fide loan.  See, e.g., Frierdich v. Commissioner,

supra at 182-184; Haber v. Commissioner, 52 T.C. 255, 266 (1969),

affd. 422 F.2d 198 (5th Cir. 1970).  The record contains copies

of the 10 loan agreements between Kaider and Quinn.  Copies of

nine agreements are signed by Kaider but not by Quinn.  A copy of

the 10th agreement, dated July 22, 2005, is signed by both Kaider

and Quinn.

The IRS contends that the loan agreements do not show an

intent to establish bona fide loans because:  (1) they were not

signed by Quinn, making them unenforceable under Florida law; (2)

they were not notarized and recorded; and (3) they were not

negotiated.  The IRS's arguments present factual questions about

whether Quinn signed the agreements and whether negotiations

---

[22]The failure of Gym World is irrelevant because Kaider did not work at the gym until after he received the checks.  See Fisher v. Commissioner, 54 T.C. 905, 910 (1970) (borrower's ability to repay evaluated on basis of circumstances when funds were advanced); supra pts. 3.e and 3.f.i.

occurred.  To resolve these issues, we must resolve the conflicting testimonies of Kaider and Quinn.

### 1.   Kaider's Testimony

Kaider testified that the 10 loan agreements arose from periodic discussions in which he told Quinn that he hoped to buy out his partner in Pride Pavement Striping, buy a new house, or pay his home mortgage.  During those discussions, Quinn would offer to lend Kaider money, pull up a template loan agreement[23] on the computer, and fill in the blanks.  The amount of each loan was determined by Kaider's needs.[24]  Kaider said he did not negotiate the terms of the loan agreements besides the amount.  After he and Quinn agreed on an amount, they would print two copies of the agreement and sign it.[25]  But Kaider was confused why nine agreements in evidence lacked Quinn's signature.

### 2.   Quinn's Testimony

Quinn testified that the checks were payments for Kaider's services.  Although he was aware of the 10 loan agreements, he testified that he did not draft or sign these loan agreements or

---

[23]Quinn's template loan agreement was family "folklore". Kaider testified that Quinn always used the same loan agreement regardless of the situation.  The template loan agreement provided for a five-year loan at 6 percent annual interest.

[24]The default amount in the template was $5,000.

[25]The signing of the agreements was memorable because Quinn insisted that they both sign in blue ink.  It was "another one of Uncle Ed's legends that black ink is not legal and you have to sign in blue."

any other loan agreements with Kaider from 2005 to 2006. Quinn declared that he would not have lent money for a five-year term. If he had lent money to Kaider, the term of the loan "would have been less than a year" because it was "improper for a small company to lend that kind of money, especially to family."[26] Quinn's five-year loan agreement with Turner Health & Fitness, however, contradicts his testimony that he did not lend money for terms over a year.[27] In fact, Quinn's later testimony revealed that he had signed "15 or 20" loan agreements with Turner Health & Fitness that involved terms exceeding one year. When asked whether he had executed loan agreements with other organizations involving terms longer than a year, Quinn became evasive.

### 3. Resolution

We find that Kaider and Quinn entered into written loan agreements corresponding to each of the 10 checks Kaider received. Of the 10 loan agreements, the July 22, 2005 agreement is the only

---

[26]Quinn believed only banks and mortgage companies should provide long-term loans.

[27]On Mar. 8, 2004, Quinn entered into a written agreement with Turner Health & Fitness, Inc., to lend the company $10,000 at 5 percent annual interest, with the full amount plus interest due five years from the date of the agreement (the Turner Health & Fitness agreement). The Turner Health & Fitness agreement is nearly identical in language and in format to the loan agreements with Kaider. The only significant differences are the amount lent and the slightly lower interest rate (5 percent instead of 6 percent). The Turner Health & Fitness agreement was signed by Quinn as "President" (no entity stated) and Mike Turner as President of Turner Health & Fitness, Inc. It was notarized and recorded at the Circuit Court of Seminole County, Florida.

agreement in evidence that has Quinn's signature. See supra note 15 and accompanying text. However, Kaider testified credibly that he and Quinn had signed all the agreements. Quinn testified that he did not sign the agreements and would not have lent money for terms over a year, but we do not believe him. First, Quinn was not a credible witness.[28] Second, his testimony that he did not sign any agreements was not believable given that the July 22, 2005 agreement had his signature. Third, the five-year loan to Turner Health & Fitness and "15 or 20" similar loans indicates that he did lend money for terms longer than a year.

The lack of notarization and recording does not detract from the loan agreements' evidentiary weight. As we stated in Zohoury v. Commissioner, T.C. Memo. 1983-597: "Intra-family loans are many times informal arrangements which may not comply with all of the customary legal formalities that would surround a commercial loan." See also Barton v. Commissioner, T.C. Memo. 1979-234; Dorzback v. Collison, 93 F. Supp. 935 (D. Del. 1950).

We reject the IRS's contention that the loan agreements were not negotiated. Kaider and Quinn negotiated the amount of each loan. And although the agreements followed Quinn's template, we

---

[28]Quinn's testimony was generally inconsistent. For example, Quinn testified that Kaider drafted the Turner Health & Fitness agreement and that the terms were "totally inappropriate". The bottom of the agreement, however, states: "This document was prepared by: Edward T. Quinn".

believe Kaider agreed with the terms.  Thus the agreements were the product of bargaining.

We conclude that the loan agreements show an intent to create a debtor-creditor relationship.

C.    Security, Interest, a Fixed Repayment Date, and a Repayment Schedule

Security, interest, a fixed repayment date, and a repayment schedule suggest that the parties intended a bona fide loan.  See, e.g., Welch v. Commissioner, 204 F.3d at 1230-1231; Frierdich v. Commissioner, 925 F.2d at 183-184.  A lack of security, a low interest rate, and an open-ended repayment date suggest otherwise. Frierdich v. Commissioner, supra at 183-184.

The agreement provisions show an intent to establish bona fide loans.  For each loan, Kaider agreed to pay 6 percent annual interest and adhere to a fixed repayment date.  Given the intrafamily context, we find the low interest rate and the lack of security insignificant.  See Zohoury v. Commissioner, supra; Barton v. Commissioner, supra.

D.    How the Parties' Records and Conduct Reflect the Transaction

If the parties treated the transaction as a loan, it suggests that they intended a bona fide loan.  See, e.g., Spheeris v. Commissioner, 284 F.2d 928, 930-931 (7th Cir. 1960), affg. T.C. Memo. 1959-225; Mann Constr. Co. v. Commissioner, T.C. Memo. 1999-183; Schiffgens v. Commissioner, T.C. Memo. 1984-137.  The 10 checks each had "loan" in the memo line.  Kaider testified that

Quinn wrote "loan" on the handwritten checks and approved the addition of "loan" to the computer-generated checks before signing them. Quinn testified that Kaider added "loan" to each check after Quinn had signed them. We believe Kaider. Quinn was aware that Kaider was depositing the checks and that Kaider thought they were loans. Yet he did not explain why, if he thought the checks were not loans, he failed to correct Kaider's impression that they were loans. We also do not find Quinn a credible witness generally. See supra note 28 and accompanying text.

The fact that the checks were drawn from Quinn's personal bank account further confirms that they were personal loans and not compensation from Mill-It By Quinn. Quinn testified that a court order prevented him from opening a bank account in Mill-It By Quinn's name and that for this reason he paid the company's expenses from his personal bank account. But bank records reveal that Quinn opened a bank account in Mill-It By Quinn's name and used it to pay the company's expenses. Two bank statements show payments for roughly $26,000 in expenses from July 18 to August 31, 2005.

Also, Mill-It By Quinn did not deduct the checks as compensation on its 2006 tax return, which is consistent with the checks being loans. In sum, Kaider and Quinn treated the checks as loans.

E.    Whether the Borrower Has Made Repayments

If the borrower has made repayments, it suggests that the parties intended a bona fide loan.  See, e.g., Welch v. Commissioner, supra at 1231; Frierdich v. Commissioner, supra at 184.  This factor is neutral.  By the time of trial, Kaider had not made repayments; but none of the loans were due.

F.    Whether the Lender Has Demanded Repayment

A demand for repayment suggests that the parties intended a bona fide loan.  See, e.g., Estate of Rosen v. Commissioner, T.C. Memo. 2006-115; Mann Constr. Co. v. Commissioner, supra.  This factor is neutral.  By the time of trial, Quinn had not demanded repayment; but no payments were due.  Quinn testified that when he advanced the funds, he did not intend to enforce repayment.[29]  But we do not believe him.

G.    The Likelihood That the Loans Were Disguised
       Compensation for Services

There is no evidence that the checks were disguised compensation for services.  See Frierdich v. Commissioner, supra at 184-185 (finding that purported loan was disguised advance payment of attorney's fees).  Any uncompensated services that Kaider rendered to Quinn, Mill-It Corp., or Mill-It By Quinn were insignificant compared to the amount of money he received from the

_____

[29]Quinn testified that he never intended to demand repayment of the amounts because they were "payroll".

10 "loan" checks.[30]  Characterizing the checks as compensation for services would mean that Kaider received $58,500 for 1 hour and 15 minutes of making QuickBooks reports, 10 hours of preparing the Mill-It Corp. compilation, 1 day of discussing Mill-It By Kaider-Quinn, and "45 minutes every other day" of assisting Quinn with miscellaneous tasks.[31]  Kaider already received $200 in wages from Mill-It By Quinn, an amount which (at least partially) covered his assistance with the company's startup activities-- designing a logo, a business card, and a T-shirt; showing Eddie and Kacey how to use QuickBooks; and attending the event at the Roadbuilders Association.[32]  Two other facts make it more likely that the checks were loans:  (1) Quinn lent Kaider $10,000 in 2003, which Kaider repaid; and (2) Quinn paid most of Kaider's living expenses in Florida.

---

[30]In Fisher v. Commissioner, 54 T.C. at 912, we concluded that the taxpayer's services were worth more than his stated salary.  We held that the purported loans from his employer were compensation for services.

[31]Kaider testified that he and Quinn agreed to no compensation when signing the June 27, 2005 agreement (the "internship" offer).  When the loan agreements arose, Kaider did not ask to be paid for the miscellaneous tasks because he was just "eating [Quinn's] food and * * * going through the DVD's".  The work "maybe amounted to * * * 45 minutes every other day of him [i.e., Quinn] just saying, well, can you help me with this aspect of something to do with his e-mail account."

[32]Kaider's $6,000 in wages from Gym World sufficiently compensated him for his 35 to 40 days at the gym.  We thus ignore this work in evaluating what services the $58,500 may have covered.

H.    The Testimony of the Purported Borrower and Lender

Courts consider the testimony of the parties to a transaction in determining whether they intended a bona fide loan.  See Frierdich v. Commissioner, 925 F.2d at 185.  Kaider testified that he and Quinn intended the checks to be loans.  He said that he intended to repay Quinn and that when Quinn gave him the checks, Quinn said:  "you bet * * * you're going to pay it back."  Quinn, on the other hand, testified that the checks were compensation for the various services that Kaider rendered to him personally, to Mill-It Corp., and to Mill-It By Quinn.[33]  According to Quinn, Kaider proposed that Quinn pay him $5,000 a month, and Quinn agreed.[34]

Kaider's testimony that the checks were loans is supported by objective evidence:  the ability to repay, the checks with "loan" in the memo line, the loan agreements corresponding to the checks, the fixed interest rate, the fixed repayment dates, and the improbability that the checks were disguised compensation for services.  To the extent Quinn's testimony contradicts Kaider's, we do not find Quinn credible.

_____

[33]Quinn did not distinguish among his companies in his mind. He viewed Kaider's employer as Edward Quinn, Mill-It Corp., and Mill-It By Quinn in the aggregate.

[34]Quinn testified that the $12,000 check, dated Aug. 30, 2005, consisted of Kaider's monthly compensation plus moving expenses.  Quinn did not testify about the $6,500 check dated Apr. 26, 2006.

We conclude that Kaider received $21,500 in bona fide loans in 2006, the year in issue.  Kaider and Quinn had an actual, good faith intent to establish a debtor-creditor relationship when Kaider received the checks.  Therefore, the $21,500 is not includable in Kaider's 2006 income.

To reflect the foregoing,

Decision will be entered

under Rule 155.