T.C. Memo. 2018-68

UNITED STATES TAX COURT

BRADFORD J. SARVAK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30150-15.                     Filed May 21, 2018.

<u>Erika E. Peterson</u> and <u>Jerry M. Lobb</u>, for petitioner.

<u>Heather K. McCluskey</u> and <u>Jeffrey L. Heinkel</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>: Respondent determined deficiencies in petitioner's Federal income tax of $359,668 and $452,461 and accuracy-related penalties of $71,934 and $90,492 for 2011 and 2012, respectively. Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years

**[*2]** in issue, and all Rule references are to the Tax Court Rules of Practice and

Procedure.

The stipulated issues for our consideration are: (1) whether Emery

Financial, Inc. (Emery), an S corporation wholly owned by petitioner, is entitled to

a bad debt deduction of $363,210 for 2011; (2) whether petitioner had unreported

capital gains for the years in issue as a result of distributions that he received from

Emery; and (3) whether petitioner is liable for the accuracy-related penalties under

section 6662(a).

## FINDINGS OF FACT

Some facts have been stipulated and are incorporated in our findings by this

reference. Petitioner resided in California when he filed the petition.

Emery

Petitioner has a real estate mortgage broker's license. He incorporated

Emery in California in 1993, and during the years in issue he was Emery's sole

shareholder and president. Emery was a mortgage broker business that brokered

home loans for residential buyers. It acted as an intermediary between borrowers

and lenders. It did not hold any loans itself. As of the date of trial Emery was no

longer actively doing business.

[*3]   Emery elected to be treated as an S corporation for Federal income tax purposes, and for the years in issue it filed Forms 1120S, U.S. Income Tax Return for an S Corporation.  On its return for 2011 Emery claimed a deduction for bad debts of $363,210.  Emery's general ledger reflects that in 2011 it wrote off four debts totaling $1,088.  The remaining $362,122 of the claimed bad debt deduction for 2011 was attributable to a write off for advances made to William Boehringer.

Advances to Boehringer

Petitioner first met Boehringer in 2003, when Boehringer was subdividing a property in Aspen, Colorado.  Petitioner purchased one lot in Aspen from Boehringer, which petitioner developed and later sold.  Boehringer engaged in land development and building projects, and between 2003 and 2006 petitioner was familiar with some of Boehringer's projects in Aspen and in California.

In 2011 petitioner authorized Emery to make a series of advances to Boehringer and to others on Boehringer's behalf.  The 2011 advances were made by checks, credit card payments, and wire transfers.  The balance of these advances was recorded on Emery's general ledger as a loan receivable from Boehringer.  The general ledger reflects that between June and December 2011 Emery made 24 advances to or for Boehringer, as follows:

[*4]

| Date | Debit |
|------|-------|
| June 3 | $35,000 |
| June 9 | 10,000 |
| June 9 | 11,000 |
| June 29 | 5,000 |
| June 30 | 2,984 |
| July 12 | 1,500 |
| July 22 | 2,000 |
| July 26 | 44,607 |
| Aug. 15 | 3,000 |
| Aug. 18 | 2,999 |
| Sept. 6 | 35,245 |
| Sept. 15 | 5,000 |
| Sept. 19 | 4,276 |
| Sept. 19 | 17,000 |
| Sept. 25 | 28,129 |
| Oct. 3 | 23,000 |
| Oct. 20 | 5,000 |
| Oct. 26 | 53,858 |
| Nov. 16 | 5,000 |
| Nov. 16 | 10,000 |
| Nov. 18 | 5,000 |
| Nov. 25 | 33,360 |
| Dec. 8 | 20,000 |
| Dec. 21 | 20,000 |

[*5] Some of the advances were made to Boehringer or on his behalf, and some were made to or on behalf of Boehringer's business partner in Switzerland. Between June and December 2011 Emery's general ledger reflects one credit to Boehringer's loan receivable account of $20,836, described in the memo line as "Zurich hotel credit". As of December 21, 2011, the balance of the 2011 advances was $362,122.

Boehringer did not execute any notes for the 2011 advances. The advances were unsecured, and neither Emery nor petitioner made a public filing to record a debt in connection with the advances. Petitioner did not know the business activities that Boehringer or his partner in Switzerland conducted. He thought that Boehringer was getting back into the development business.

An adjusting entry in Emery's general ledger for December 31, 2011, reflects that petitioner instructed that the loan receivable for the 2011 advances be written off. Emery's trial balance for 2012 reflects that it made another loan to Boehringer in 2012. Petitioner did not know the purpose for the 2012 advance.

Emery's Distributions

As Emery's president and shareholder, petitioner authorized distributions to himself during the years in issue. At the time of the distributions he had access to

[*6] all of Emery's financial information.  In 2011 petitioner received total distributions of $1,651,455.  In 2012 he received distributions of $2,007,699.

Tax Reporting

For the years in issue Emery reported ordinary business losses of $258,370 and $453,441, respectively.  Petitioner claimed Emery's losses on Schedules E, Supplemental Income and Loss, Part II, Income or Loss From Partnerships and S Corporations, attached to his Forms 1040, U.S. Individual Income Tax Return.  He engaged the same firm of certified public accountants (CPA firm) to prepare Emery's returns and his individual returns for the years in issue.  Emery's in-house bookkeeper provided the information that the CPA firm used to prepare Emery's returns, and she reviewed the returns that the CPA firm prepared for Emery.  Petitioner looked at Emery's returns, but he did not meet with anyone at the CPA firm to go over the returns or their contents.

For the years in issue Emery reported on its returns the distributions to petitioner.  It issued Schedules K-1, Shareholder's Share of Income, Deductions, Credits, etc., for petitioner that reflected the distributions and reported them as "[i]tems affecting shareholder basis".

**[*7]**  Petitioner did not report any amounts of the distributions that he received from Emery for the years in issue on his individual returns.  On those returns he reported income tax liabilities of $41,735 and $1,991, respectively.

Examination

Respondent's revenue agent Shelly S. Gordon conducted an examination of petitioner's income tax returns for the years in issue.  In the course of the examination Gordon proposed accuracy-related penalties under section 6662(a) for petitioner.  She prepared a Civil Penalty Approval Form (penalty approval form) that she forwarded to a group manager, who was her immediate supervisor. The group manager signed and dated the penalty approval form and approved the proposed penalties for petitioner on March 27, 2015.  On September 4, 2015, respondent sent to petitioner the notice of deficiency upon which this case is based.

Respondent determined adjustments to Emery's income for the years in issue.  The adjustments determined for Emery flowed through to petitioner and were reflected in the notice of deficiency as increases to income reported on Schedules E.  Respondent disallowed the full amount of Emery's claimed bad debt deduction for 2011.  Respondent disallowed for both years in issue deductions that Emery had claimed for commissions, automobile expenses, and travel, meals, and

[*8] entertainment. The parties have stipulated Emery's allowable deductions for those expenses. In addition to adjustments determined for Emery, respondent determined in the notice of deficiency that petitioner had unreported long-term capital gains for the years in issue.

OPINION

I.    Bad Debt Deduction

Generally the taxpayer bears the burden of proving that the Commissioner's determinations set forth in the notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioner bears the burden of establishing that Emery is entitled to any deductions, including the claimed bad debt deduction for 2011. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Winter v. Commissioner, 135 T.C. 238 (2010) (where a notice of deficiency includes adjustments for S corporation items with other items, we have jurisdiction to determine the correctness of all adjustments). He has neither claimed nor shown that he meets the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

Section 166(a)(1) allows a deduction for any debt that becomes wholly worthless within the taxable year. To deduct a business bad debt, the taxpayer

[*9] must establish the existence of a valid debtor-creditor relationship, that the debt was created or acquired in connection with a trade or business, the amount of the debt, the worthlessness of the debt, and the year that the debt became worthless. Davis v. Commissioner, 88 T.C. 122, 142 (1987), aff'd, 866 F.2d 852 (6th Cir. 1989). Respondent contends that petitioner has failed to establish any of these elements as they relate to the 2011 advances.

A bad debt is deductible only for the year in which it becomes worthless. Denver & Rio Grande W. R. R. Co. v. Commissioner, 32 T.C. 43, 56 (1959), aff'd, 279 F.2d 368 (10th Cir. 1960); see also Hatcher v. Commissioner, T.C. Memo. 2016-188, at *17-*18, aff'd, __ F. App'x __, 2018 WL 1721752 (5th Cir. Apr. 9, 2018). Worthlessness of the debt is determined by an objective standard and is usually shown by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991); Dustin v. Commissioner, 53 T.C. 491, 501 (1969), aff'd, 467 F.2d 47 (9th Cir. 1972); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950). The subjective opinion of the taxpayer that the debt is uncollectible, without more, is not sufficient evidence that the debt is worthless. Fox v. Commissioner, 50 T.C. 813, 822-823 (1968), aff'd per order, 70-1 U.S. Tax Cas. (CCH) para. 9373 (9th Cir. 1970).

**[*10]** Petitioner failed to present any evidence that the alleged debt was objectively worthless in 2011. He testified only as to his subjective belief. Emery's general ledger reflects that it advanced funds to Boehringer on December 21, 2011, and petitioner did not identify any events between that date and the end of the year which showed that the alleged debt was uncollectible. He testified that Boehringer told him in "[e]arly 2012" that he could not repay the 2011 advances; he offered no reasoning as to why in that case the alleged debt should be treated as being worthless on December 31, 2011.

Even accepting petitioner's uncorroborated testimony, Boehringer's 2012 statement would not be enough to establish that the alleged debt to Emery was objectively worthless. Petitioner did not describe any actions taken to try to collect the alleged debt, and he testified that he did not know whether Boehringer was actually insolvent in 2012. There is no reasonable explanation for advancing more funds to Boehringer in 2012, which petitioner also described as a "business loan", if the prior advances were deemed totally unrecoverable. See Hatcher v. Commissioner, at *18.

Petitioner has also failed to establish that the 2011 advances constituted a bona fide debt and that the parties intended to create a bona fide debtor-creditor relationship. See sec. 1.166-1(c), Income Tax Regs. ("Only a bona fide debt

[*11] qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."). Generally a debtor-creditor relationship exists if the debtor genuinely intends to repay the loan and the creditor genuinely intends to enforce repayment. Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970). Factors indicative of a bona fide debt include: (1) whether the purported debt is evidenced by a note or other instrument; (2) whether any security was requested; (3) whether interest was charged; (4) whether the parties established a fixed schedule for repayment; (5) whether there was a demand for repayment; (6) whether any repayments were actually made; and (7) whether the parties' records and conduct reflected the transaction as a loan. See, e.g., Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121; see also Kaider v. Commissioner, T.C. Memo. 2011-174.

Boehringer did not execute any notes, and petitioner did not request any collateral or other security for the 2011 advances. Petitioner has not provided any documents reflecting the terms for the purported loan. He testified that "[i]t was implied that * * * [Boehringer] was going to pay me back 10 percent [interest]",

[*12] but he provided no corroborating evidence that the parties understood that the advances would carry an interest rate.

Apart from the way that the advances were recorded in Emery's general ledger, the parties' conduct does not reflect that the advances were intended as a bona fide loan. Emery made a series of unsecured advances to or for Boehringer, and as the balance of the advances rapidly increased Emery did not receive any offsetting payments or obtain any guaranties of repayment. Petitioner has not claimed that he and Boehringer agreed to a schedule for repaying the advances or that he ever demanded repayment. He contends that he determined that the advances were uncollectible as of December 31, 2011, only 10 days after the last advance had been made and without making any efforts to collect the amounts allegedly owed. He testified that by early 2012 he believed Boehringer would not be able repay the advances, but he continued to direct Emery to advance him more funds.

Petitioner contends that he had a "good-faith expectation" that Boehringer would repay him. Boehringer did not testify. Petitioner testified about his prior business dealings with Boehringer, but the objective evidence and the preponderance of all evidence suggests that petitioner had no genuine intention of requiring Boehringer to repay the 2011 advances. The real purpose of the

**[*13]** advances remains unexplained, but we are not persuaded that a bona fide debt was created.

Petitioner has failed to establish whether and when the 2011 advances became worthless or that the advances should be considered a bona fide debt for tax purposes. Petitioner provided no evidence to substantiate the existence or the amounts of the four smaller debts that Emery wrote off and claimed as part of its bad debt deduction for 2011. Accordingly, we sustain respondent's determination to disallow the bad debt deduction in full.

## II. Distributions From Emery

Respondent contends that petitioner failed to report capital gains from the distributions that he received from Emery, because for both years in issue the distributions were in excess of petitioner's adjusted basis in Emery's stock. In cases of unreported income the Commissioner bears the initial burden of producing evidence linking the taxpayer to the receipt of funds before the general presumption of correctness attaches to a determination. Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). The record contains Schedules K-1 issued by Emery for petitioner that reflect distributions to him for the years in issue. Petitioner does not dispute that he received the distributions. Respondent has met the initial burden of production, and petitioner bears the burden of establishing

**[\*14]** that the unreported distributions should be excluded from income.  Gemma

v. Commissioner, 46 T.C. 821, 833 (1966).

Sections 1366 through 1368 govern the tax treatment of S corporation

shareholders such as petitioner.  Section 1366(a) provides generally that a

shareholder shall take into account his or her pro rata share of the S corporation's

items of income, loss, deduction, or credit for the S corporation's taxable year

ending with or in the shareholder's taxable year.  Section 1367(a) provides that a

shareholder's basis in stock of the S corporation is increased by items of income

passed through to the shareholder under section 1366(a), and decreased by passed-

through items of loss and deduction.  See sec. 1367(a)(1) and (2).  A shareholder's

stock basis is also decreased by distributions received from the S corporation that

are not includible in income pursuant to section 1368.  Sec. 1367(a)(2)(A).

A distribution by an S corporation that has no accumulated earnings and

profits is treated in the manner provided in section 1368(b).  See sec. 1368(a); sec.

1.1368-1(c), Income Tax Regs.  Neither party contends and the record does not

reflect that Emery had accumulated earnings and profits; thus section 1368(b)

applies to determine the treatment of petitioner's distributions.  Section 1368(b)(1)

provides that a distribution "shall not be included in gross income to the extent

that it does not exceed the adjusted basis of the stock."  A distribution or any

**[*15]** portion thereof that exceeds the adjusted basis is treated as gain from the sale or exchange of property. Sec. 1368(b)(2).

Petitioner contends that he did not take distributions in excess of basis. He contends that he was personally liable to Emery for the distributions that he received during the years in issue because he received them in violation of the California Corporations Code. The California Corporations Code provides that a shareholder who knowingly receives any distribution that exceeds the amount of the corporation's retained earnings immediately prior to the distribution is liable to the corporation for the amount so received. See Cal. Corp. Code secs. 500, 506 (West 2014). For each of the years in issue Emery's tax return reflected that it had negative retained earnings. Petitioner contends that his liability to Emery under California law "increased his debt basis in the corporation".

Section 1367(b)(2)(A) provides that if for the taxable year certain items in section 1367(a)(2) exceed the amount that would reduce a shareholder's stock basis to zero, the excess of those items shall be applied to reduce (but not below zero) the shareholder's basis in "any indebtedness of the S corporation to the shareholder." (Emphasis added.) Petitioner has not argued or shown that he lent Emery funds or that he assumed direct liability for any debts that Emery owed to outside creditors. See sec. 1.1366-2(a)(2)(i), Income Tax Regs. ("The term basis

**[*16]** <u>of any indebtedness of the S corporation to the shareholder</u> means the shareholder's adjusted basis * * * in any bona fide indebtedness of the S corporation that runs directly to the shareholder."). He has not established that the corporation should be indebted to him for anything. Rather, he contends that the distributions at issue created an indebtedness that <u>he owed to the corporation</u>. A debt for which he was liable to Emery could not have increased his basis in the indebtedness of Emery. Petitioner misinterprets the cited Code and regulatory provisions in arguing that his purported obligation to repay the distributions created debt basis.

Furthermore, even if petitioner established that he had basis in some bona fide indebtedness of Emery, it would not affect the taxability of the distributions that he received for the years in issue. Section 1368(b)(1) provides that a distribution is not included in gross income only "to the extent that it does not exceed the adjusted basis of the stock." Section 1368 does not reference a shareholder's basis in indebtedness. Section 1367(b)(2)(A) does not identify distributions that decrease a shareholder's stock basis under section 1367(a)(2)(A) as an item that shall be applied to a shareholder's debt basis after the stock basis has been reduced to zero. Under the relevant Code sections distributions are measured only against the basis of the shareholder's stock.

[*17] We agree with respondent that the distributions must be reported as income and treated as capital gain to the extent that they exceeded petitioner's basis in Emery's stock. "[B]asis is a specific fact which the taxpayer has the burden of proving." O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), aff'g T.C. Memo. 1957-193. The stipulated exhibits include a copy of a spreadsheet that the CPA firm prepared to calculate petitioner's stock basis and copies of other tax and financial documents that petitioner submitted with the spreadsheet. However, petitioner failed to address these exhibits at trial and he did not argue at trial or on brief that he had sufficient stock basis to exclude the distributions from gross income. He does not dispute respondent's calculations of his stock basis for the years in issue.

Respondent's basis calculations rely in part on audit adjustments determined for Emery, which should be changed to reflect the parties' stipulations regarding Emery's deductible expenses. In all other respects, because petitioner has failed to meet his burden of proof, we sustain respondent's calculations of petitioner's basis in Emery's stock. Allowing for computational adjustments, we sustain respondent's determination that petitioner had unreported capital gain for the years in issue.

[*18] III.     Section 6662(a) Penalties

Section 6662(a) and (b)(1) and (2) imposes a 20% penalty on any portion of an underpayment of Federal income tax that is attributable to negligence or disregard of rules or regulations or a substantial understatement of income tax.  An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000.  Sec. 6662(d)(1).  Respondent contends that even after concessions made with respect to Emery's deductible expenses petitioner substantially understated his income tax liabilities for both years in issue.  Alternatively, respondent contends that petitioner acted negligently or in disregard of rules and regulations.  Only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the types of conduct listed in section 6662(b).  New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009).  Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties.  Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Section 6751(b)(1) provides that "[n]o penalty * * * shall be assessed unless the initial determination of such assessment is personally approved (in writing) by

**[*19]** the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." A majority of this Court held in Graev v. Commissioner (Graev II), 147 T.C. 460 (2016), that the question of whether a penalty was properly approved under section 6751(b) was premature in a deficiency case, because the penalty was not yet assessed. On March 20, 2017, the Court of Appeals for the Second Circuit issued its opinion in Chai v. Commissioner, 851 F.3d 190 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42, in which it disagreed with the majority's analysis in Graev II. The Court of Appeals for the Second Circuit held that section 6751(b) "requires written approval of the initial penalty determination no later than the date the IRS issues the notice of deficiency (or files an answer or amended answer) asserting such penalty." Chai v. Commissioner, 851 F.3d at 221. When Chai was issued, a final decision in Graev had not yet been entered.

Trial of this case was held on April 19, 2017, and the final brief ordered at the time of trial was filed by petitioner on September 18, 2017. As of those dates this Court's position regarding compliance with section 6751(b) continued to be the position held by the majority in Graev II. On December 20, 2017, we issued Graev v. Commissioner (Graev III), 149 T.C. __ (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). In Graev III, 149 T.C. at __ (slip op.

**[\*20]** at 14), we held, consistent with the analysis of the Court of Appeals for the Second Circuit in <u>Chai</u>, that the Commissioner's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirement of section 6751(b).

On February 26, 2018, respondent filed a motion to reopen the record so that respondent could submit evidence of supervisory approval for the determined penalties. Petitioner objects to respondent's motion.

Reopening the record for the submission of additional evidence lies within the Court's discretion. <u>Nor-Cal Adjusters v. Commissioner</u>, 503 F.2d 359, 363 (9th Cir. 1974), <u>aff'g</u> T.C. Memo. 1971-200; <u>Butler v. Commissioner</u>, 114 T.C. 276, 286-287 (2000). We will grant a motion to reopen the record only if the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. <u>Butler v. Commissioner</u>, 114 T.C. at 287. By the motion respondent seeks to reopen the record to offer into evidence the declaration of the examining agent, Gordon, and a penalty approval form signed by Gordon's immediate supervisor and dated before the issuance of the notice of deficiency.

The evidence that is the subject of respondent's motion would not be cumulative of any evidence in the record, and it would not be impeaching material.

**[\*21]** Respondent bears the burden of production with respect to penalties and would offer the evidence as proof that the requirements of section 6751(b)(1) have been met. The subject evidence is material to the issues involved in the case, and we conclude that the outcome of the case will be changed if we grant respondent's motion.

Petitioner objects to our granting respondent's motion on the grounds that the motion is untimely and that granting the motion would result in "inherent unfairness". He states in his opposition to the motion that section 6751(b) has been "on the books since 1998" and that Chai was decided before trial in this case. He contends that despite having "multiple opportunities" to submit the subject evidence respondent "saw fit to ignore its burden of production". However, at the time of trial and briefing, it was not the position of this Court that respondent's burden of production included showing supervisory approval of the penalties. The applicable precedent after Graev II, and before Graev III, was that compliance with section 6751(b) was not even properly at issue in a deficiency case.

Petitioner contends that granting respondent's motion would result in "dissimilar treatment * * * for similarly situated petitioners", citing Ford v. Commissioner, T.C. Memo. 2018-8. In Ford the Commissioner failed to present evidence of compliance with section 6751(b) and did not move to reopen the

[*22] record.  We did not sustain the determination of the penalties.  Ford v. Commissioner, at *6.  We reject petitioner's contention that he would be subjected to "dissimilar treatment" if we granted respondent's motion in this case and allowed the subject evidence into the record.  We will grant the motion to reopen the record and have included the relevant facts in our findings.

Petitioner has argued that he should not be liable for the accuracy-related penalties because he had reasonable cause and acted in good faith with respect to the underpayments of tax.  See sec. 6664(c)(1).  He contends that he relied on advice given by the CPA firm that prepared the returns filed for him and for Emery for the years in issue.  To establish reasonable cause through reliance on professional advice the taxpayer must prove that (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

A partner from the CPA firm testified generally as to the preparation of petitioner's and Emery's returns.  He testified that he advised petitioner with respect to the treatment of the bad debt deduction that Emery claimed for 2011 and the distributions that petitioner received but did not report as income.  Petitioner

**[\*23]** testified, however, that he does not discuss completed returns or their contents with the preparers at the CPA firm. He testified that Emery's bookkeeper was responsible for providing the financial information that the CPA firm used to prepare the returns, and he did not know what information or documents the bookkeeper had provided.

The partner testified on direct examination that he considered the substantiation requirements for bad debt deductions in connection with the 2011 advances and that he believed petitioner satisfied those requirements. However, on cross-examination he could not recall any documents that Emery provided regarding the alleged bad debt or when he was told that the advances were uncollectible. Petitioner testified that he was not notified that the advances were uncollectible until 2012. We do not believe that a tax professional familiar with the requirements for bad debt deductions would advise a client to claim a deduction for a year before the debt was actually suspected to be worthless, much less with the knowledge that the client would continue to make advances under those circumstances.

The partner testified that during the information gathering process Emery's bookkeeper told him that petitioner was directly liable to Emery's creditors and he therefore determined petitioner had debt basis. However, no documents were

[*24] introduced in connection with this testimony to show that Emery or petitioner actually had creditors. The partner did not identify any debts that he knew about for which petitioner was liable. He testified that the CPA firm kept a running total of petitioner's basis, but at no point did he attempt to refute respondent's basis calculations or explain why the worksheets that his firm prepared showed different amounts. When respondent's counsel asked him how a distribution could create debt basis, his answers were initially nonresponsive. Ultimately, the partner acknowledged that "[a] [d]istribution does not create debt basis." Petitioner now takes a position that his preparer explicitly rejects, contending in his brief that his distributions did create basis.

In short, petitioner presented no persuasive evidence that he had reasonable cause or acted in good faith with respect to any portions of his underpayments for the years in issue. The record reflects that even after respondent's concessions regarding Emery's expenses petitioner's understatements of tax are substantial in the light of our holdings. The available facts also demonstrate that petitioner disregarded applicable provisions of the Code and regulations in reporting his taxes for the years in issue. For example, he failed to attach a statement of facts to Emery's return for 2011 to substantiate the claimed bad debt deduction, as required under section 1.166-1(b)(1), Income Tax Regs. He also failed during the

[*25] years in issue to maintain books or records sufficient to calculate his basis and to compute his tax liabilities with respect to the distributions that he received from Emery. See sec. 6001; sec. 1.6001-1, Income Tax Regs.

To the extent that petitioner substantially understated his income tax liabilities and disregarded applicable rules or regulations, respondent has satisfied the burden of production by providing sufficient evidence to show that the penalties are appropriate. Petitioner has not established any reason why the penalties should not apply. Accordingly, we sustain the determination of the penalties under section 6662(a).

We have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit. To reflect the foregoing,

An appropriate order will be

issued and decision will be entered

under Rule 155.